MARATHON OIL COMPANY,
Plaintiff-Appellee,

v.

FEDERAL ENERGY ADMINISTRATION
et al., Defendants-Appellants.

No. 6–11.

Temporary Emergency Court of Appeals.

Argued Sept. 17, 1976.

Decided Dec. 6, 1976.

As Amended Dec. 8, 1976.

Rehearing Denied Jan. 10, 1977.

Scott H. Lang, Federal Energy Administration, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Stanley D. Rose, C. Max Vassanelli, Dept. of Justice, Washington, D. C., were on the brief for defendants-appellants.

John W. Hackett, Jr., Shumaker, Loop & Kendrick, Toledo, Ohio, with whom Thomas G. Pletz, David W. Wicklund, Toledo, Ohio, were on the brief for plaintiff-appellee.

J. Furman Lewis, Marathon Oil Co., Findlay, Ohio, for the plaintiff-appellee.

Before CHRISTENSEN, JAMESON and GRANT, Judges.

CHRISTENSEN, Judge.

This case presents the question of whether, absent express authority in the Emergency Petroleum Allocation Act for the regulation of credit terms as such, the Federal Energy Office, now the Federal Energy

Administration (FEA),[1] was precluded from requiring a continuation of normal credit practices by suppliers of petroleum products as a part of its "maintenance of normal business practices rule."

In the light of *Shell Oil Co. v. FEA*, 527 F.2d 1243 (Em.App.1975), and *Atlantic Richfield Co. v. Zarb*, 532 F.2d 1363 (Em. App.1976), which the court below interpreted as requiring the striking down of the credit terms "regulation", we must reexamine the breadth and flexibility of the agency's powers in accomplishing the objectives of the Act and the administrative deference rule which, with other considerations, led us in *Condor Operating Company v. Sawhill*, 514 F.2d 351 (Em.App.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975), to sustain as neither arbitrary, capricious nor beyond statutory authority the FEA's supplier/purchaser relationship maintenance rule concerning the sale of domestic crude oil.

Plaintiff-appellee, Marathon Oil Company, filed this action in the district court to enjoin the enforcement of provisions of the FEA's regulations dealing with rentals of real property used in the retailing of gasoline,[2] and credit terms under which its products were sold.[3] The rental regulations were held invalid in *Shell Oil, supra*, and that ruling is not disputed in this case.

Marathon further contended successfully before the district court, and its position remains the same here, that the FEA lacked authority under § 4(a) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 753(a) (Supp. V, 1975), to require the maintenance of normal credit terms in petroleum product transactions as a part of its mandatory allocation and pricing program. Because power to regulate credit terms was expressly granted in the now expired Economic Stabilization Act[4] but not explicitly continued by the EPAA,[5] Congress must have intended, Marathon argued, to withhold from the President any authority to control credit terms in connection with sales of petroleum products. Marathon additionally asserted that the maintenance of seasonal credit terms and payment schedules in "summer fill" and other "dating" programs

1. The Federal Energy Office became the Federal Energy Administration on June 27, 1974, pursuant to the Federal Energy Administration Act of 1974 (Pub.L. No. 93–275). Both FEO and FEA for convenience generally will be referred to hereinafter as "FEA".

2. 10 C.F.R. §§ 212.101–103 (1975), 3 CCH Energy Management ¶¶ 13,863–65.

3. "Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter. 'Summer fill' programs and other 'dating' or seasonal credit programs are among the normal business practices which must be maintained by a supplier under this paragraph, if that supplier had such programs in effect during the base period. Credit terms other than those associated with seasonal credit programs are included as a part of the May 15, 1973 price charged to a class of purchaser under Part 212 of this Chapter. Nothing in this paragraph shall be construed to require suppliers to sell to purchasers who do not arrange proper credit or payments for allocated products, as customarily associated with that class of purchaser during the base period (for seasonal credit), or on May 15, 1973 (for other credit terms). However, no supplier may require or impose more stringent credit terms or payment schedules on purchasers than those in effect for that class of purchaser during the base period (for seasonal credit), or on May 15, 1973 (for other credit terms)." 10 C.F.R. § 210.62(a), 2 CCH Energy Management ¶ 13,-532.05.

4. 12 U.S.C. § 1904 note. Up until the expiration date, April 30, 1974, "interest rates" were expressly made subject to regulation by § 203(a)(2) of the Act while § 203(e) empowered the President to require the issuance of regulations or orders providing for the stabilization of "interest rates and finance charges", both without limitation as to activities, industries or sections of the economy.

5. "Not later than fifteen days after [this Act's enactment], the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. . . ." EPAA § 4(a), 15 U.S.C. § 753(a) (Supp. V, 1975).

under 10 C.F.R. § 210.62(a) was not consistent with provisions in § 4(b)(2) of the EPAA requiring provision, among other things, for a dollar-for-dollar passthrough of net increases in the cost of crude oil, residual fuel oil and refined petroleum products, and use of the same date in the computation of markup, margin and posted price for such products.

The latter contention was not reached by the district court in view of its agreement with Marathon's major contention that there was an overriding absence of authority for the agency to "regulate" credit terms at all. On cross-motions for summary judgment, it concluded that "10 C.F.R. § 210.-62(a) [see n. 3] is invalid as beyond the scope of authority granted by the Emergency Petroleum Allocation Act . . . to the extent that it regulates the credit terms which a supplier of petroleum products may apply to the purchaser of said products." Accordingly, the court granted plaintiff's (appellee's) motion for summary judgment and denied defendants' (appellants') motion.

Conceding that "the government's reasoning with respect to the necessity for regulating credit is much more cogent than it is with respect to rents", the district court found itself unable to "circumvent the fact that no authority was granted under the Allocation Act to regulate credit." [6] Principally on this theory, it concluded that *Shell Oil* and *Atlantic Richfield, supra,* mandated invalidation of the regulation in question, and it added:

> The Government relies heavily upon the legislative history of the Allocation Act, and while it is clear from said history that Congress intended to continue the price controls established by Phase IV under the Stabilization Act, *Consumers Union of the United States v. Sawhill,*

525 F.2d 1068 ([Em.App.] 1975), it is not at all clear that credit terms were being regulated under Phase IV. In fact, the opposite is true. Interest rates and finance charges were not subject to regulation under Phase IV. See *Cost of Living Council Freeze Regulations, Special Freeze Questions and Answers No. 8,* Question 12, 38 Fed.Reg. 17491 (July 2, 1973); *Cost of Living Council Ruling 1972–73,* 37 Fed.Reg. 197491 (July 6, 1972). Thus even though Congress intended the Phase IV price controls to continue, this did not include the regulation of credit terms. This Court is therefore compelled to find that, as with rental regulations, the regulation of credit terms is beyond the scope of the authority granted in the Allocation Act.

We granted the government's motion for stay pending appeal and denied Marathon's motion to dismiss the appeal or in the alternative to affirm, in the tentative view that the appeal could not be considered frivolous and, particularly, that *Shell Oil* and *Atlantic Richfield* did not as a matter of law foreclose the government's position. Thus, we maintained the status quo pending more thorough consideration following briefing and oral argument.

■ In *Shell Oil* this court determined that the FEA at the time in question had no power to regulate rentals of service station property either from any independent authorization or as a part of its authority to regulate oil allocations and pricing under the EPAA. The problem here presented, however, for reasons which follow, is not analogous to those we confronted in *Shell Oil,* and *Atlantic Richfield,* accepting each of the grounds of decision there as correctly determined.[7]

---

**6.** We assume that the district court, rather than begging the question of implied power, sought to make the point that no express authority having been granted with reference to credit terms, as such, there was indication by Congress that the usual rule of implied power to do whatever is necessary or convenient in the execution of express powers should not apply and that the agency could not touch upon credit

terms at all in regulating other aspects of the allocation and pricing of petroleum products.

**7.** Reaffirmation of the rationale of *Shell Oil* by and in the context of *Atlantic Richfield Co. v. Zarb,* 532 F.2d 1363 (Em.App.1976), *supra,* was dicta in a sense, since the latter case was controlled by its own holding that after the lease of a service station had expired, the operator's attempt to tie his product demand to an illegal

In both cases, there was involved a regulation of the operation of service stations, *per se*,[8] as distinguished from the provision here in question tied closely to the maintenance of normal business practices in relation to pricing of products.[9] In turn, the latter aspect of the regulation is more clearly allied with the continuation of the relationship device basic to the allocation program as a whole.[10]

A little history will render other distinctions plainer and establish that while the trial court would have been accurate if it had observed that credit terms were not regulated throughout the entire economy under Phase IV, it erred in assuming that credit terms in connection with the sale of petroleum products had not been.

The Economic Stabilization Act of 1970, as amended 12 U.S.C. § 1904 note, gave the President authority to "stabilize prices, rents, wages and salaries" as well as to "stabilize interest rates and corporate dividends and similar transfers at levels consistent with orderly economic growth." § 203(a)(1) and (2).

During Phase IV, the Cost of Living Council (CLC) made the decision that, as a general matter, it would not control finance charges and interest rates as it had authority to do under the Stabilization Act. It did, however, control credit terms and payment schedules in its Phase IV petroleum regulations, inaugurated in mandatory form on August 19, 1973, 38 Fed.Reg. 22536 (Aug. 22, 1973), in connection with "a class of

---

**8.** 10 C.F.R. § 212, Subpart G, 39 Fed.Reg. 1924 (Jan. 15, 1974) as amended 39 Fed.Reg. 15139 (May 1, 1974):

"212.101. This part applies to each leased property used in the retailing of gasoline where both the lessor and lessee are refiners, resellers or reseller-retailers as defined in this part.

"212.103. A lessor or lessee of real property used in retailing gasoline may not [then follows regulations with reference to the base period and there is added:]

"(C) impose any operating requirements on the retailer which would be unreasonably inconsistent with the standards or goals of the Emergency Petroleum Allocation Act of 1973 or the Federal Energy Office including but not limited to a requirement that the retailer extend his hours of operation beyond his customary hours of operation."

**9.** It is to be recalled that § 210.62(a) [*see* n. 3] provides in pertinent part:

"Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period . . . Credit terms other than those associated with seasonal credit programs are included as a part of the May 15, 1973 price charged to a class of purchaser under Part 212 of this Chapter."

occupancy did not invoke any right pursuant to the continuation of wholesale-purchaser relationships requirement. Indeed, that portion of *Shell Oil* upon which the appellee here relies similarly might be considered dicta; the court otherwise determinatively concluded that the rental regulation from the beginning was invalid, "[f]inding that no circumstances exist justifying a failure to comply with Section 4 of the Administrative Procedure Act . . . ." in its promulgation.

**10.** See the "General provisions", Subpart A and the numerous other provisions referred to therein and particularly:

"§ 211.2 Relationship of subparts.

"Unless otherwise specified in Subparts D through K of this part, the general provisions set forth in this subpart apply to the mandatory allocation of all allocated products.

"§ 211.9 Supplier/purchaser relationships.

"(a) *Supplier/wholesale purchaser relationship.* (1) Each supplier of an allocated product shall supply all wholesale purchaser-resellers and all wholesale purchaser-consumers which purchased or obtained that allocated product from that supplier during the base period as specified in Subparts D through K of this part.

"(2)(i) Unless otherwise provided in this part or directed by FEA, the supplier/wholesale purchaser-reseller relationships defined by specific dates or base periods or otherwise imposed pursuant to this part shall be maintained for the duration of the Mandatory Petroleum Allocation Program and may not be waived or otherwise terminated without the express written approval of FEA.

"(ii) Unless otherwise provided in this part or directed by FEA, the supplier/wholesaler purchaser-consumer relationships defined by specific dates or base periods or otherwise imposed pursuant to this part shall be maintained for the duration of the Mandatory Petroleum Allocation program and may not be revised or otherwise terminated except that any such relationship may be terminated by the mutual consent of both parties. . . ."

This court has addressed other aspects of the continued relationship requirement in *Condor, supra*, and *Amtel, Inc. v. FEA*, 536 F.2d 1378 (Em.App.1976).

purchaser rule." 6 C.F.R. § 150.355(b) (1974) (the basic refiner price rule) and § 150.359(c) (the basic reseller and retailer price rule) each provided that a firm could not charge any class of purchaser a price exceeding the base prices for that product. The base price was defined as "the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973", plus certain adjustments. 6 C.F.R. § 150.355(g)(1)(i). *See also* § 150.359(c)(1). A "class of purchaser" was in turn defined as "purchasers or lessees to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers or lessees and other purchasers or lessees." And "a customary price differential" was defined in § 150.31 as "a price distinction based on a discount, allowance, add-on, premium and an extra based on a difference in volume, grade, quality, or location or type of purchaser or a term or condition of sale or delivery."

An unchallenged affidavit of O. T. Vipperman, Jr., Director of Price and Allocation Policy of FEA shows that based upon these regulations, CLC required suppliers to maintain any customary differentials in the base price for each class of purchaser in existence on May 15, 1973, and that as an element of the base price and customary price differential, suppliers of petroleum products were required to maintain discounts and other terms or conditions of sale or delivery, including credit terms and payment schedules in effect on May 15, 1973.

Pursuant to delegated authority under the EPAA, the agency issued proposed mandatory allocation price regulations on December 11, 1973, 38 Fed.Reg. 34414. The proposed price regulations incorporated the CLC's Phase IV petroleum price regulations.

> With respect to economic units and transactions subject to this part, the maximum price which a seller may charge and a buyer may pay is the price permitted pursuant to the provisions set forth in Part 150 of Title 6 of the Code of Federal Regulations. 38 Fed.Reg. 34414 at 34434 (Dec. 13, 1973).

This price rule was enacted on December 27, 1973, 39 Fed.Reg. 744 (Jan. 2, 1974).

On January 14, 1974, the FEA issued new Mandatory Petroleum Allocation and Price Regulations, 39 Fed.Reg. 1924 (Jan. 15, 1974). These were set out in Parts 200–212 of 10 C.F.R. Again CLC's Phase IV petroleum price regulations were substantially incorporated into FEA's Mandatory Petroleum Price Regulations.

In addition to Part 212 of the FEA regulations, which contained the price rules, the initial FEA regulations contained a Part 211, setting out the various allocation programs mandated by the EPAA, and a Part 210 containing general allocation and price rules applicable to the programs set forth in both parts 211 and 212. As issued on January 14, 1974, Part 210 contained a provision, Sec. 210.62(a), which required the maintenance of "normal business practices", including a specific prohibition against imposing more stringent credit terms or payment schedules than were in effect during the base period. Thus, CLC's control of credit terms as they directly pertained to transactions involving petroleum products, was made an explicit part of FEA's regulatory scheme.

The affidavit of Mr. Vipperman explains the reasoning and policy of the agency:

> Although the CLC regulations [under Phase IV] had also controlled credit terms and payment schedules implicitly . . . the FEA determined that this rule should be made explicit due to the likelihood that firms might otherwise revise their credit or payment arrangements in a manner that would frustrate or circumvent the mandatory price and allocation regulations in Parts 211 and 212. Moreover, although the requirement to maintain normal business practices had been interwoven into the price regulations by the CLC's class of purchaser doctrine, it was not similarly contained in the allocation regulations and it was feared that without such a provision sup-

pliers would attempt to engage in payment schedule practices which would frustrate the allocation programs. . .

The agency's separate regulation of credit terms as a function principally of price and regulation of certain seasonal credit terms as a function primarily of allocation represented recognition of the varying roles which credit and other conditions of sale can play in the flow of product.

On November 27, 1973, the EPAA had become law.[11] Prior to that time the Energy Policy Office had published for comment proposed mandatory petroleum allocation and price regulations. These proposed regulations contained a provision calling for the continuation of normal business practices, including maintenance of preexisting credit terms. 38 Fed.Reg. 21797 at 21802 (Aug. 13, 1973).

Mandatory allocation and price regulations had been issued as to propane (38 Fed.Reg. 27397 (Oct. 3, 1973)) and middle distillate fuels (38 Fed.Reg. 28660 (Oct. 16, 1973)), with specific reference to the maintenance of normal business practices, including credit terms.

There is no room for doubt that Congress knew of these regulations and proposals when it considered passage of the Act. The committee report recited that "most of the work [in drafting a regulatory framework] has already been accomplished."[12] There are other indications of congressional intent that the new fuel allocation program should be patterned after the previously proposed program.[13]

The lack of a specific grant of authority to regulate credit terms was taken by the lower court as evidence that the disputed authority was not intended. We think the opposite conclusion is more reasonable in view of the legislative history cited. Appellee's argument, that if Congress had intended the agency to "regulate" credit terms it would have expressly granted that authority, fails also because a general grant was not intended; only the limited power necessarily implied for the exercise of the authority expressly granted over the allocation and pricing of petroleum products or oil.

Aside from legislative history, to deny to the agency the power in question would be inconsistent with the broad discretion and flexibility we have consistently recognized in the agency's mandated attainment of the objectives of the EPAA.[14] We here are not

11. The EPAA has been amended and extended by the "Energy Policy and Conservation Act", P.L. 94–163, 89 Stat. 871. These amendments will not be further referred to since they are not pertinent here.

12. "The President is specifically directed [by the Act] to promulgate a regulation providing for the mandatory allocation of crude oil . . within 10 days of enactment and to make that regulation effective 15 days thereafter. In normal events, this would be an extraordinarily short time for so complex a task. Most of the work, however, has already been accomplished. The Administration has had several months experience under the voluntary program. Drafting of a mandatory program has been in progress for over two months. Moreover, in August the President published for comment a proposed mandatory allocation program of similar scope to that called for in this bill." H.R.Rep. # 93–531, 93d Cong., 1st Sess. (Sept. 29, 1973) at p. 12, U.S.Code Cong. & Admin.News 93d Cong., 1st Sess., pp. 2582, 2589 (1973). The program here referred to obviously is the EPO's Proposed Mandatory

Fuel Allocation Program above-mentioned (38 Fed.Reg. 21797 (Aug. 13, 1973)).

13. Section 6(a) of the EPAA provides:

"All actions duly taken pursuant to [§ 203(a)(3) of the Stabilization Act] in effect immediately prior to the effective date of the regulation promulgated under section 4(a) of this Act, shall continue in effect until modified pursuant to this Act." Those actions included CLC Phase IV regulations which required the maintenance of normal business practices including "credit terms and payment schedules". See also EPO Mandatory Allocation Program for Propane Fuels, 38 Fed.Reg. 27397, 27398 & 5 (Oct. 3, 1973), and EPO Mandatory Allocation Program for Middle Distillate Fuels, 38 Fed. Reg. 28660, 28662–63 §§ 8–9 (Oct. 16, 1973). See also H.R.Rpt. # 93–638, pp. 20–21, 93d Cong., 1st Sess. (Nov. 10, 1973), U.S.Code Cong. & Admin.News 93d Cong., 1st Sess., pp. 2688, 2697 (1973).

14. See, e. g., Cities Service Co. v. FEA, 529 F.2d 1016 (Em.App.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); Pasco, Inc. v. FEA, 525 F.2d 1391 (Em.App.

dealing with any attempt to regulate credit terms or interest generally, such as would have been invited had Congress empowered the agency to do so in the terms employed by the Stabilization Act on the subject. Detailed powers necessary or convenient to the allocation and pricing authority granted with reference to the petroleum industry did not have to be spelled out, for the Congress, as well as judges, was fully cognizant of the doctrine of implied powers. The

1975); *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.1975), *supra.*

**15.** 753 . . . (a) Not later than fifteen days after November 27, 1973, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. . . .

(b)(1) The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

. . . . .

(D) preservation of an economically sound and competitive petroleum industry . . . .

. . . . .

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry . . . .

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

In this connection recurrence to Chief Judge Tamm's language in *Consumers Union of U. S., Inc. v. Sawhill,* Appendix, 525 F.2d 1068, 1072 (Em.App.1975) is yet again salutary:

"It is appropriate at this juncture to digress momentarily to elaborate on the breadth of FEA's regulatory discretion under the Act. A starting point is the proposition that 'the width of administrative authority must be measured in part by the purposes for which it was conferred.' *Permian Basin Area Rate Cases,* 390 U.S. 747, 776, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Nowhere could this oft-repeated rubric be more relevant than where Congress acts in a crisis situation. The Emergency Petroleum Allocation Act is Congress' response to precisely such a situation. The regulations mandated by section 4(a) are to provide for, to the maximum extent practicable, the *broad* objectives of section 4(b)(1), *supra* part I. One would be at great pains to characterize this legislation as pervasively filling every interstice, leaving only mandatory duties to the administrative body charged with its implementation. To the con-

mandating of regulations to achieve the broad objectives enumerated in the Act [15] essentially entailed selection on the part of the agency of means in its judgment best suited, as to which the rule of deference for administrative decisions [16] should not be departed from or grudgingly applied by the unwarranted extension sought by appellee of *Shell Oil* and *Atlantic Richfield.*[17] What was said in *Condor* is applicable to this aspect of the overall program there addressed.[18]

trary, I think the Congressional intent was to hew a sphere of responsibility within which FEA could decide how to proceed against the crisis. The grant of such broad regulatory discretion is inconsistent with Consumer's Union's and the majority's view of FEA's statutory responsibilities." At pp. 1077–78.

**16.** *Fry v. United States,* 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Tasty Baking Co. v. Cost of Living Council,* 529 F.2d 1005 (Em.App.1975); *Reeves v. Simon,* 507 F.2d 455 (Em.App.1974); *Mandel v. Simon,* 493 F.2d 1239 (Em.App.1974); *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun.,* 481 F.2d 1388 (Em.App.1973); *University of Southern California v. Cost of Living Council,* 472 F.2d 1065 (Em.App.1972).

**17.** *Cf.* the later case of *Spinetti v. Atlantic Richfield Co. and FEA,* (TECA Nos. 9–35, Oct., 1976), in which we remanded for evidentiary hearing concerning an asserted violation of the supplier/purchaser relationship requirement of 10 C.F.R. § 211.9, despite Atlantic Richfield's contention there that since its claimed violation involved only a continued use of "real estate" the doctrine of *Shell Oil* concerning "rental regulations" precluded further consideration as a matter of law. We thus resisted the tyranny of the term "real estate regulation" for a deeper look at substance in respect to the allocation and pricing authority of the agency.

**18.** "We are of the view not only that Congress had the power to grant authority to the President and his delegates within the guidelines of the Act to pursue the objectives enumerated, but that the regulation in question, as a part of the entire plan, was a rational exercise of that power. . . . 'We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted.' *Permian Basin Area Rate Cases,* 390 U.S. 747, 777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312 (1968)." 514 F.2d at p. 359.

In sum, the district court's assumption that under Phase IV credit terms had not been controlled by CLC is negated by the record. Unlike the rental situation of *Shell Oil* and *Atlantic Richfield,* there appears no legislative history inconsistent with the credit terms provisions in question; on the contrary there are affirmative indications that Congress intended to grant authority to promulgate just such rules as have been imposed. Credit terms are more clearly a function of pricing and allocation than service station rentals. Having conceded power to prevent and punish evasion of allocation or pricing measures on an *ad hoc* basis, the agency had authority to impose general requirements to facilitate and render practical its expressly granted power with respect to petroleum products. Neither the appellee nor the trial court has recognized sufficiently the distinction between power to regulate credit terms *per se* and power to regulate such terms as a reasonable and non-arbitrary, non-capricious means of more effectively regulating the pricing and allocation of petroleum products to achieve the objectives of such expressly granted power. Neither the trial court nor the appellee have founded their position on any contention that the regulations are arbitrary or capricious. And to deny totally the authority in question, as the trial court's judgment would do if permitted to stand, would obstruct unduly the judgment and discretion of the agency and limit the doctrine of implied powers in unjustifiable departure from the rule of deference to which this court is committed. For the reasons stated, the summary judgment granted by the district court must be reversed.

In the briefs and at oral argument references were made to a possible alternative rationale for upholding the district court's decision as it deals with "summer-fill" and other "dating" programs under 10 C.F.R. § 210.62(a)—the theory that the regulation was invalid because it failed to comply with the "dollar-for-dollar passthrough" provision of § 4(b)(2)(A) of the EPAA (15 U.S.C. § 753(b)(2)(A)), and the "date in the computation of markup, margin, or posted price" provision of § 4(b)(2)(C) of the EPAA (15 U.S.C. § 753(b)(2)(C)). Because the lower court did not reach these issues, and in view of changes the related regulations have undergone since the filing of this lawsuit, we deem it inappropriate to further consider them in the first instance. The case must be remanded to the lower court for such consideration.

Reversed and remanded for further proceedings not inconsistent with this opinion.