MOBIL OIL CORPORATION, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and Frank Zarb, Administrator-Federal Energy Administration, Defendants.

Civ. A. No. CA–3–75–0527–D.

United States District Court,
N. D. Texas,
Dallas Division.

Feb. 2, 1977.

984

Leo J. Hoffman, Dallas, Tex., for plaintiff.

Charles D. Cabaniss, Asst. U. S. Atty., Dallas, Tex., for defendants.

MEMORANDUM OPINION

ROBERT M. HILL, District Judge.

The cross motions of the parties for summary judgment came on for consideration before the Honorable Robert M. Hill, United States District Judge. The court has considered the motions, the briefs and arguments of counsel, and is of the opinion that the plaintiff's motion should be denied and the defendants' motion granted.

This case arises from a suit by Mobil Oil Corporation (hereinafter "Mobil") for declaratory judgment that the Federal Energy Administration (hereinafter "FEA") lacks statutory authority to regulate any products of natural gas and that FEA regulations purporting to do so are invalid. Mobil urged the necessity of a full trial to resolve questions of industry usage of certain technical terms contained in the statute in question. The court ruled to the contrary in its order of May 31, 1976, instructing the parties to proceed upon cross-motions for summary judgment.

## I. Disposition by Summary Judgment

■ The court's procedural disposition of this case presents a threshold issue. Federal Rule of Civil Procedure 56(c) allows summary judgment to be rendered if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The language of the rule differentiates fact from law, a distinction similar to that made in delineating the provinces of judge and jury. Yet although statutory construction is a matter of law within the exclusive province of the judge,[1] it may nevertheless require some fact development. Summary judgment may or may not be appropriate:

Before the court can apply the law, it must have an adequate factual basis for doing so. In some situations, for example, a fuller development of the facts may serve to clarify the law or help the court determine its application to the case. As a result, the resolution of complex questions of law frequently requires a more concrete factual development than may be obtained through summary proceedings.

10 Wright and Miller, Federal Practice and Procedure § 2725 (1973). The need for fact development is strongest in cases of judicial lawmaking in which the court must perform an essentially legislative function: arriving at a rule with broad public consequences after consideration of complex facts and competing economic and political considerations. Antitrust litigation is the paradigm of judicial lawmaking, and Wright and Miller cite *White Motor Company v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), to illustrate the inappropriateness of summary judgment for some matters of law.

■ The present case is not such a matter. First, the legal issue is narrow: the statute either does or it does not comprehend liquid hydrocarbons from natural gas. The court is not required to choose one of a multitude of possible formulations of a rule of law.

Second, although the court concedes the materiality of the industry usage of technical language appearing in the statute, no significant dispute about such industry usage exists in this case. The parties agree that the term "crude oil" does not in industry usage encompass natural gas liquids and condensates extracted from natural gas. They likewise agree that the industry refers to butane and propane as "LPG," whether recovered at a refinery or extracted from natural gas.[2] The exact extent to which the industry uses the term "refined petroleum products" is unclear to the court. But the plaintiff states that the industry does not use this term to include natural gas liquids, and the court does not believe that the defendant contests this characterization. In any event, the court accepts for purposes of summary judgment all the plaintiff's contentions about industry usage of the terms "crude oil," "LPG," and "refined petroleum product," the language contained in the statute.

■ Third, the underlying industrial facts necessary for intelligent construction are largely undisputed and are extensively developed by the affidavits on file. None of the technical facts about the differing

---

1. "Questions involving the existence, contents, validity, interpretation, construction, or meaning and effect of a statute . . . are questions for the court." 75 Am.Jur.2d § 395 (1974).

2. Defendant's Memorandum of May 3, 1976 at 5–6.

geneses (from natural gas as contrasted to crude oil) of propane and butane and their ultimate chemical identity and interchangeable industrial uses are contested. If trifling arguments about peripheral technical points do lurk undetected in the bowels of these proceedings, the court believes they are properly eliminated from its consideration.[3] The conflicting inferences which the parties seek to draw from essentially undisputed and fully developed industrial practices would not be sharpened by a trial on the merits. As the court stressed in its ORDER, a trial on such issues would only divert attention from more important considerations of legislative history. Under these circumstances, summary judgment provides an appropriate mechanism for disposing of a legal question of statutory construction in which the legislative history and policy are by far the most important considerations. *See Schlothan v. Territory of Alaska,* 276 F.2d 806, 815 (9th Cir. 1960).

## II. A Precis

▆▆ In construing the scope of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C.A. § 751 et seq. (hereinafter Allocation Act), this court must strive to ascertain the legislative intent by whatever means available: legislative history; statutory analogy; the internal harmony of the statute's provisions; extrapolation from general legislative policy; statutory use of trade terminology; administrative interpretation; etc. These are only some of the arguments made by counsel to infer this intent. The court will analyze these points more particularly below, but it has in sum awarded the race to the government because it showed stronger and more direct proof of congressional intent as manifested in the Energy Policy and Conservation Act

of 1975 (hereinafter Conservation Act), which amended the Allocation Act. The Conservation Act amendments unambiguously allowed the President to *decontrol* "natural gas liquids and natural gas liquid products." The conclusion is irresistible to this court that Congress itself believed that the original Allocation Act controlled these same substances.

A second more inferential but nonetheless compelling argument by the government hinges on the general energy policy behind the Allocation Act. The court accepts the government's reasoning that one very important objective of this act lay in control of propane and butane____an objective that would be almost completely frustrated by Mobil's proposed construction. Mobil has, through its very able counsel, made some telling arguments in opposition from the act's usage of terminology with commonly accepted meanings in the oil industry and also from the drafting and organization of the Allocation Act on its face. However, when Mobil's inferences of legislation intent are balanced against the government's arguments, the court concludes that Mobil has at best shown that the Allocation Act was inartfully drafted.

## III. Industry Usage and Congressional Usage Contrasted

Propane and butane may be refined from crude oil in an oil refinery or they may be recovered from processing natural gas by fractionating—a mechanical means.[4] The end products are in all respects identical, but Mobil contends that the FEA's power to regulate chemically identical fuels depends upon their source. A fuel can never, it is argued, rise above its geological origins to occupy a higher regulatory stratum.

**3.** For example, the defendant states that condensate is "often *classified* as a light crude oil" by the industry. Affidavit of Ottie Vipperman at 7. Plaintiff hotly disputes this, asserting that condensate is merely "*used* by the industry *as the equivalent* of light crude oil." Affidavit of David N. McClanahan at 11. Since the term "light crude oil" is not even contained in the statute, the court sees no necessity for a trial to resolve such marginal fact issues.

**4.** Propane, butane, ethane, natural gasoline, and condensate are all recovered from the "wet" natural gas stream and are generically known as "natural gas liquids." (The court will in this opinion refer to these liquid hydrocarbons only as natural gas liquids, ignoring the subcategory of condensates).

Mobil bases its conclusion primarily on the statutory language but also on legislative history. It first argues that the statute by its terms deals only with crude oil and products of crude oil. Section 4(a) of the Allocation Act, 15 U.S.C.A. § 753(a), contains the basic grant of authority to the executive branch to promulgate regulations "for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product." Assuming that legislative parlance parallels industry usage, it is clear that neither "crude oil" nor "residual fuel oil" refers to natural gas liquids and natural gas liquid products. Authority, if any, over natural gas liquids and products must stem from "refined petroleum product." "Refined petroleum product" is in turn defined by Section 3(5), 15 U.S.C. § 752(5), to be "gasoline, kerosene, distillates (including Number 2 fuel oil), LPG,[5] refined lubricating oils, or diesel fuel" (emphasis added). Section 3(6), 15 U.S.C. § 752(6), defines "LPG" as "propane and butane but not ethane."

Mobil argues in essence that the authority of the FEA over LPG (propane and butane) can be no broader than the definition of "refined petroleum product," of which it is a part. The oil industry uses the word "refine" solely in reference to the processing of crude oil by effecting molecular changes. The industry does not describe the mechanical separation of natural gas liquids as "refining." Ergo, LPG from natural gas liquids cannot be a *refined* petroleum product" under FEA jurisdiction.

Mobil also argues that the other terms[6] defined in Section 3 of the Allocation Act, which involve concepts of "brand," "marketing," "trademark," etc., apply to crude oil refiners and their marketing systems but make no sense when applied to natural gas processors. Mobil thus infers that Congress intended the scope of the Allocation Act to cover only crude oil refining.

Both of these arguments are well-drawn, and the court does not dismiss them lightly. Mobil's major premise, however, is that Congress intended to adopt industry usage. The court finds several convincing indications in the legislative history of this bill and in subsequent legislative actions that Congress did not follow industry usage.

First, the most direct refutation of Mobil's argument that Congress would not ignore industry usage lies in the fact that the Senate did exactly that in its original version of the Allocation Act. S. 1570 addressed shortages of "crude oil (including natural gas liquids) and refined petroleum products (including liquid petroleum gas)." The Senate unambiguously intended to cover liquid petroleum gas (LPG) as a "refined petroleum product." Moreover, the heart of the Senate bill (and one of the principal goals of the Allocation Act as passed) required fair dealings between major oil companies and independents. Section 105(c) of the Senate bill required 1) "any producer or importer of crude petroleum and/or natural gas liquids" to sell to "independent refiners" the same proportion of their output as in the base period;[7] and 2) "all refiners or importers of petroleum products" to sell to independent dealers in the same proportions as during the base period. Since the bill unquestionably covered natural gas liquids, this language further indicates that the Senate considered "refining" to include the production of LPG from natural gas by mechanical separation.

Second, the letter of Dr. John Dunlop, Chairman of the Cost of Living Counsel (hereinafter COLC), was read into the Congressional Record on November 14, 1973, the date of Senate passage of the Allocation Act, by Senator Henry Jackson, chairman of the conference committee. This letter

5. The term LPG (liquid petroleum gas) refers to propane, butane, and propane-butane mixtures. It more properly refers to products from natural gas but in industry usage also includes the same chemically identical products of refining. Affidavit of David N. McClanahan at p. 6; Affidavit of Ottie Vipperman at p. 7.

6. The terms defined in Section 3 include "branded independent marketeer," "non-branded independent marketeer," "independent refiner" and "small refiner."

7. October 1, 1971 to September 30, 1972—before the energy crunch.

requested congressional interpretation of "crude oil," as it affected the stripper well exemption in Section 4(e)(2) of the Act. Senator Jackson, presuming to speak for the conference committee, responded that Dr. Dunlop's interpretation was correct: "crude oil" included natural gas liquids produced at the wellhead of oil wells. 119 Cong.Rec. at 37085, 37087 (Nov. 14, 1973). The letter is evidence that Congress was not using the term "crude oil" as the industry uses this language.[8]

Mobil has thrown up many quibbling arguments about the weight of this letter: Dr. Dunlop wasn't in Congress; Senator Jackson is only an individual congressman, etc. Given the positions of the two correspondents, the letter plainly gives a significant indication whether or not Congress was using statutory language in the same manner as the oil industry does.

Mobil has also objected that the FEA has in its quasi-judicial capacity ruled that "crude oil," as used in the stripper well exemption, does not include natural gas liquids recovered at a gas processing plant. The court, however, finds no inconsistency in FEA Ruling 1974–30 (39 Fed.Reg. 4416, Dec. 24, 1974). The FEA has for reasons of economic policy unrelated to semantics placed some production of natural gas liquids outside the scope of the stripper well exemption.[9] The ruling never altered the

FEA's treatment of those natural gas liquids recovered at the wellhead as "crude oil."

The point which should not be lost in this barrage of technical information and agency rulings is that the letter is evidence that Congress did not follow strict industry terminology in at least one provision of the Allocation Act. The FEA rulings demonstrate a reasonable approach to this problem: analyzing the language in light of energy policy rather than citing petroleum textbooks as holy writ.

Third, and by far the most important in the court's view, Congress manifested in the Conservation Act amendments of 1975 its understanding that "refined petroleum products" include natural gas liquids. The Conservation Act, P.L. 94–163, among other things amended the Allocation Act by adding a new Section 12, 15 U.S.C.A. § 760a. Section 12 provides that the President may, under certain circumstances, decontrol the "refined petroleum products" subject to allocation under Section 4(a).[10] The inclusion of "natural gas liquids" in the definition of "refined petroleum products," with reference to substances controlled under Section 4(a), makes it quite clear that despite any ambiguity on the face of Section 4(a), Congress itself understood Section 4(a) to include natural gas liquids within its scope. Congress provided the power to decontrol

8. This variance from industry usage is heightened by plaintiff's burning conviction, expressed at length in its briefs and affidavits, that while condensate may be industrially indistinguishable from "crude oil," condensate is not, never has been and never will be "crude oil." *See* note 3, *supra*.

9. The FEA ruled that it would not count production of natural gas liquids from casing head gas toward measurement of production for the stripper well exemption if the natural gas liquids were recovered at a gas processing plant (as contrasted to recovery at the wellhead and transportation with the crude petroleum stream).

10. Section 12 provides in pertinent part:

\* \* \* \* \* \*

(b) Except as provided in subsection (a), the President may amend the regulation under section 4(a) if he determines that such amendment is consistent with the attainment, to the maxi-

mum extent practicable, of the objectives specified in section 4(b)(1) . . .

(c)(1) Any such amendment which, with respect to a class of person or class of transactions . . . exempts crude oil, residual fuel oil, or any refined petroleum product or refined product category from the provisions of the regulation under section 4(a) . . . may take effect only pursuant to the provisions of this subsection.

\* \* \* \* \* \*

(3) As used in this section the term "refined product category" means

(A) motor gasoline

(B) Number 2 oils (Number 2 heating oil and Number 2–D diesel fuel)

(C) propane; or

(D) all or any portion of other refined petroleum products as a class (*including natural gas liquids and natural gas liquid products, other than propane*). (emphasis added).

these substances because it obviously believed that it had earlier controlled them under the terms of the Allocation Act.

The court finds this amendment to be the best indication of congressional intent with respect to the ambiguous language of the Allocation Act. Mobil is indeed hard pressed to explain it. Mobil has argued that since the Allocation Act never included natural gas liquids within its jurisdiction, an amendment excepting natural gas liquids cannot affirmatively create any jurisdiction. This argument is such complete question-begging that it requires no comment. Mobil has also countered that the conference committee report on the Conservation Act expressly stated that its bill would not result in any changes in the definitions of the Allocation Act. Senate Conference Report No. 94–516, 1975 U.S. Code Cong. and Adm.News at 2047. The problem with this argument is that it cuts the wrong way for Mobil. If Congress stated that it didn't intend to change any definitions, it presumably thought that natural gas liquids were already covered within the definition of "refined petroleum product."

The court therefore rejects Mobil's contention that Congress necessarily intended to vigorously adhere to industry usage. Inconsistent usage—by the Senate in S.1570, by Dr. Dunlop in his letter to Senator Jackson, entered in the Congressional Record, and by Congress in amending through the Conservation Act—negates this premise. Recourse to the glossary of a petroleum textbook does not satisfactorily explain the language in Section 4(a) of the Allocation Act in light of these other legislative aberrations from industry usage. To resolve the coverage of the statute, the court must consider other evidence of legislative history, energy policy, agency usage, and subsequent Congressional actions. The court has already discussed the most important subsequent congressional action, the Conserva-

tion Act amendment, and must now examine other aspects of construction.

## IV.  Legislative History of Allocation Act

Mobil has made several arguments from the legislative history of the Allocation Act. It has stressed in its briefs that this bill was a response to a single, specific crisis—the Arab embargo of *crude oil* in the fall of 1973. Since supplies of natural gas and its products were not directly affected by this embargo, they were therefore not the subject to the Allocation Act.

The court finds this argument unmeritorious. The court has read the House and Senate floor debates over this bill.[11] See 119 Cong.Rec. 18043–45, 18047–67 (June 5, 1973); 119 Cong.Rec. 34455–79 (Oct. 17, 1973); 119 Cong.Rec. 36865–70 (Nov. 13, 1973); 119 Cong.Rec. 37081–88 (Nov. 14, 1973). It has likewise read the report of the House Committee on Interstate and Foreign Commerce to H.R. 9681 (which was adopted by the conference committee with few alterations), 1973 U.S.Code Cong. and Adm.News 2582, and the Conference Report, 1973 U.S.Code Cong. and Adm.News 2688. Any fair examination of these debates and committee reports indicates that Mobil's characterization of the Allocation Act as a direct response to the Arab embargo alone is simply incorrect. It is quite possible that the fact of the Arab embargo might have speeded the bill's final passage, but it had nothing to do with the drafting of either the Senate or the House version. The floor discussion and committee reports are quite clear about the impetus for the Allocation Act: it was principally a response to the shortage of heating oil in the winter of 1972–73; the shortage of gasoline during the summer of 1973; the resulting pressure on independent service stations whose supplies were being cut off by the major oil companies; and, most pertinent to

11. Mobil asserted as a second line of defense at oral argument that if Congress had expressed concern about shortages of natural gas liquids and other fuels, this concern blossomed in other bills then pending, not this bill which Congress picked out of the hopper as a direct response to the Arab embargo. The court emphasizes that it is discussing only the Allocation Act and its direct predecessors in each house of Congress—S.1570 and H.R.9681.

this case, the problems of farmers in getting sufficient LPG to dry their crops.[12]

Hearings on the House version of the Allocation Act began in July, 1973. The House Committee on Interstate and Foreign Commerce began work on this bill in place of a previous energy bill in September of 1973. The full committee marked the bill up and reported it favorably on September 26, 1973.[13] The date of the Arab embargo, October 17, 1973, coincided with the House passage of S.1570 (which the House had amended to substitute its own bill), but there is no indication that news of the embargo affected the votes on passage of the bill. The embargo could not have had any effect on the drafting of the bill. The conference committee then adopted the House version with a few changes.[14] Thus, the characterization of the Allocation Act as solely or even principally a response to the Arab embargo cannot withstand the most cursory reading of the legislative history.

Moreover, Congress evidently did not intend to originally include crude oil within the scope of the bill. It did so only in the belief that the bill would be otherwise unworkable.[15] The thrust of the bill is not the shortage of crude oil but the competing demands of various sectors of the American economy for fuel.

If one major theme dominates the entire record, it is congressional concern for agriculture, particularly LPG necessary for crop drying. The government has set out in its brief the remarks of many senators about the plight of agriculture, and the court will not repeat them. The record shows the same concern by the House with respect not only to agriculture [16] but also to vital industries.[17]

At not one point throughout the entire legislative record is there the slightest indication that Congress distinguished between propane refined from crude oil and propane separated from natural gas liquids.[18] In

12. *See* House Report No. 93–531 (Sept. 29, 1973), 1973 U.S.Code Cong. and Adm.News 2582, 2588.

13. House Report No. 93–531, 1973 U.S.Code Cong. and Adm.News at 2591.

14. "The conference substitute generally follows the provisions of the House amendment." Conference Report 93–628 (Nov. 10, 1973), 1973 U.S.Code Cong. and Adm.News 2688. "In the final conference bill we have about 97 percent of the House version." Remarks of Rep. Collins, 119 Cong.Rec. 36866 (Nov. 13, 1973).

15. House Report No. 93–531 (Sept. 29, 1973), 1973 U.S.Code Cong. and Adm.News 2582, indicates this fact at several points. In listing the reasons why it was substituting a mandatory for a voluntary allocation program, the Committee stated that it was including crude oil within the scope of the act since "an allocation program simply would not work unless crude oil were included." *Id.* at 2589. Evidently H.R. 9681 extended the reach of a mandatory allocation program to crude oil, which was not covered by H.R. 8089. H.R. 9681 was substituted for H.R. 8089 in September, 1973. *Id.* at 2591.

16. House Report No. 93–531, 1973 U.S.Code Cong. and Adm.News at 2588.

17. Mr. WOLFF. Do I understand this bill will cover the question of allocations of propane to bring some order out of the chaos that exists in that industry today where only un-

der conditions of extreme hardship will there be allocations made and a definition of extreme hardship will be detailed and outlined? As it is now there are plants throughout this country that are closing, because they cannot get an allocation of propane, whereas beauty parlors and retail establishments are getting their allocations.

Mr. STAGGERS. That is one of the prime purposes of this bill. We did take into consideration certain uses of propane which were not provided for in the allocation order by the President under the Economic Stabilization Act. We included these needs because we realized that if they were not in there and not taken into consideration properly in the allocation program, there would be many industries that would have to close throughout America.

119 Cong.Rec. 36869 (Nov. 13, 1973).

18. There is, however, an interesting indication in the remarks of Rep. Staggers, chairman of the House Committee on Interstate and Foreign Commerce, that Congress did distinguish between propane and *natural gas*:

Mr. STAGGERS: We have retained in the conference substitute exactly what we had on that when the bill passed the House.

For instance, in the allocation of propane gas under the Stabilization Act, the President did not take into consideration the petrochemical industry's needs. I think this is a question that Mr. TAYLOR addressed him-

view of the comprehensive nature of the legislation and the strong need for mandatory allocation of propane, emphasized again and again in these proceedings, the court concludes that imputing an intention to differentiate between sources of propane on the basis of their mode of production would fly in the face of common sense.

The FEA has stated that roughly 70% of all propane and butane produced in the United States is extracted from wet natural gas by fractionation. The court does not understand Mobil to contest this fact. The self-defeating nature of an attempt to satisfy intense competition for scarce LPG by regulating only 30% of the supply is self-evident. Moreover, the FEA has set forth uncontroverted facts in the Vipperman Affidavit showing the impossible nature of regulating a minor portion of these substances on the basis of their source when they are practically indistinguishable as to source. The FEA's administrative determination that it cannot achieve the statutory objectives of Section 4(b) of the Allocation Act by regulating only 30% of LPG is entitled to some deference by the court. It is a conclusion supported by common sense and uncontroverted facts. The objectives set forth in Section 4(b)(1) of the Allocation Act—including, among others, maintenance of residential heating, maintenance of agriculture, equitable distribution of LPG between various sectors of the country and the petro-chemical industry—would be frustrated if Mobil's interpretation prevailed.[19]

This inference from policy is bolstered by the circumstances of this particular act. It must be remembered that during the time in question, summer of 1973, the administration had responded to growing shortages of petroleum products with a *voluntary* allocation program. Congress passed the Allocation Act because of its conviction that the voluntary allocation guidelines and "jawboning" were failures.[20] Given this dissatisfaction with voluntary guidelines and unsatisfactory partial compliance with them, it does not make sense that Congress would remedy dire propane shortages by placing only 30% of propane under FEA regulation.

Mobil has made a further argument from legislative history that, unlike its embargo theory, has some force. S. 1570, the original Senate version of the Allocation Act, recited as its raison d'etre "shortages of crude oil (including natural gas liquids) and refined petroleum products (including liquid petroleum gas)." The conference bill couched its findings and purposes in terms of "crude oil, residual fuel oil, and refined petroleum products." Sec. 2(a)(1). Mobil draws from this omission of "natural gas liquids" and LPG in the final bill a congressional intent to exclude these substances from regulation.

This is a reasonable inference but it is not compelled. The FEA has argued that the House, in drafting its bill, and later both houses, in passing it, intended to rely on Federal Energy Office (hereinafter "FEO")

self to—we have changed that and we make it mandatory that they would be taken into consideration. The President's program would have to be modified appropriately. I am not sure whether this is what the gentleman was talking about.

Mr. FLYNT: The distillates would be covered as well as natural gas and propane gas?

Mr. STAGGERS: Not natural gas, but propane gas.

119 Cong.Rec. 36867 (Nov. 13, 1973)

**19.** Mobil has *attempted analogy to exemptions* for crude oil, such as stripper wells, which remove a significant portion of crude oil production from regulation. Therefore, it is argued, Congress need not have necessarily intended to regulate the *entire* production of another area of the petroleum industry—LPG.

The point missed by Mobil is that such exemptions of marginal crude oil wells logically advance a *well-articulated congressional policy*: more production. Exemption of propane and butane because of their source of production is completely inconsistent with the purpose of the Allocation Act—allocation of scarce fuels between competing sectors of the economy—and serves no other rival policy that has been brought to the court's attention.

**20.** *See* House Report No. 93–531, 1973 U.S. Code Cong. and Adm.News at 2587–2591. Senator Dole's comment that "the farmers of America cannot burn voluntary guidelines and suggested priorities in their tractors" fairly reflects the Congressional attitudes toward this approach.

regulations expressly covering natural gas liquids. Those regulations were promulgated after passage of the Senate bill but before passage of the House and conference committee bills. This too is possible but is by no means a completely convincing explanation. The court's own guess is that the conference committee simply worked from the House draft and that its omission of the specific Senate language about "natural gas liquids" had no significance.

The report of the conference committee offered no explanation for this omission, unlike *Algonquin SNG, Inc. v. Federal Energy Administration,* 171 U.S.App.D.C. 113, 518 F.2d 1051 (1975) *reversed,* 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976), a case cited by the plaintiff. In *Algonquin,* the chairman of the sponsoring Senate committee unambiguously stated that the conference had removed a provision in the Senate version of a bill and gave the reasons why it had done so. Mobil in this case infers deliberate intent to omit from the cryptic language, "The Senate recedes." As the court reads this phrase, it means only that the House rather than the Senate draft would be used in the conference committee bill. It offers no direct evidence of deliberate intent to omit anything.

For purposes of comparison, the conference bill also omitted a Senate admonition in the same section of S. 1570 that no allocation plan should be promulgated which would substantially reduce crude oil or refined petroleum products. Yet the conference report reiterated its support of this policy and stated the policy to be "the clear and firm understanding on the part of the Managers of both Houses," even though the specific language was omitted in the final bill. 1973 U.S.Code Cong. and Adm. News at 2690–2691. The court is therefore reluctant to draw too much from the omission of companion language about "natural gas liquids." In the absence of any direct

evidence of the reason behind this omission, its purpose must remain ambiguous.

## V.  Congressional Ratification of F.E.A. Interpretation

Events and legislative actions contemporaneous with the Allocation Act's passage make probable the construction urged by the FEA. Subsequent legislative actions reassure the court that Congress did indeed intend to include all natural gas liquids, regardless of source, within the scope of this legislation. The specific understanding manifested in the Conservation Act has already been discussed; Congress used express language in this amendment conforming with the FEA's interpretation of "refined petroleum product."

Also important, however, is Congressional ratification of the FEA's administrative interpretation by the legislative extension in itself of the Allocation Act, with full knowledge of the agency's interpretation. In 1975 Senate and House oversight committees received detailed testimony from the FEA about the manner in which it was regulating substances covered by the Allocation Act. FEA administrators expressly testified to their regulation of natural gas liquids pursuant to (their interpretation of) the Allocation Act and some of the difficulties they had encountered.[21] These administrators read the same statement to both committees, explaining that 30% of domestic propane was refined from crude oil while 70% was processed from natural gas liquids; that COLC (Cost of Living Council) regulations broadly defined "refiners" to include natural gas processors as well; that these COLC regulations were ill-adapted to natural gas processors and that the FEA had therefore promulgated new ones; and that FEA rules provided for different pricing for propane according to its source because of economic considerations. Congress clearly understood the FEA's interpretation

---

**21.**  See testimony of Robert E. Montgomery, Jr., General Counsel, and Gorman C. Smith, then Acting Assistant Administrator for Regulatory Programs, at hearings before the House Subcommittee on Energy and Power, Committee on Interstate and Foreign Commerce, Ser. No. 94–17, 94th Cong, 1st Sess. (March 12, 1975) at 455–457; and testimony of Frank G. Zarb, Administrator of the FEA, at hearings before the Senate Committee on Interior and Insular Affairs, Ser. No. 94–16 (92–106), 94th Cong., 1st Sess. (May 19, 1975) at 509–514.

of "refined petroleum product" to parallel that of the COLC. Congress thereafter extended or modified the Allocation Act three times without suggesting the FEA lacked this authority. P.L. 94–99 (September 29, 1975); P.L. 94–133 (November 14, 1975); P.L. 94–163 (December 22, 1975) (Conservation Act).

■ The weight to be accorded such ratification is disputed by the parties, and each side has marshalled case law to support its position. The court finds no inconsistency in these authorities. The forcefulness of Congressional inertia depends in large part on the particular facts in each case. In general, however, when an opponent of an administrative interpretation of a statute challenges that interpretation before Congress and Congress reenacts the statute without change, this reenactment "is almost conclusive evidence that the interpretation has congressional approval." *Kay v. F.C.C.,* 143 U.S.App.D.C. 223, 443 F.2d 638, 646–647 (1970). On the other hand, the failure of the Congress to take any action upon complaint of an administrative interpretation, e. g. *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 240, 241, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), or congressional reenactment without any indication that Congress had been informed of the administrative interpretation, e. g., *United States v. Calamaro,* 354 U.S. 351, 359, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957); *Pacific Power & Light Co. v. F. P. C.,* 87 U.S.App.D.C. 261, 184 F.2d 272, 275 (1950), is generally entitled to little weight in ascertaining congressional intent.

The instant case falls between these extremes. It does not rise to the persuasiveness of the congressional ratification of *Kay v. F. C. C., supra,* since the FEA's administrative interpretation of its jurisdiction was never challenged before Congress. But, in contrast to the other cases cited, the FEA testified at length before Congress about its regulation of natural gas liquids and the problems it had encountered. The court must assume that Congress was aware of this interpretation when it reenacted and amended the Allocation Act. The court therefore accords some weight, although not conclusive weight, to this subsequent congressional action.

## VI. Administrative Precursors of Allocation Act

The court must finally consider the effect of COLC regulations under the Economic Stabilization Act of 1970, P.L. 91–379, 12 U.S.C.A. § 1904 note (hereinafter Stabilization Act). COLC regulations applicable to the petroleum industry included natural gas liquids as a "covered" product and defined "refiner" to include natural gas processors. 6 C.F.R. 150.352.[22] Mobil denies the relevance of these regulations since the scope of authority granted by the Stabilization Act was much broader than that conferred by the Allocation Act. For example, while the Stabilization Act provided sufficient authority to regulate service station rents, the Allocation Act does not. *Shell Oil v. FEA,* Em.App., 527 F.2d 1243 (TECA 1975), invalidated the FEA's adoption of COLC rent regulations. The FEA attempted but failed to justify these regulations under the Allocation Act alone, asserting a substantive relationship between rents and the price of petroleum products covered by the Act. By contrast, the recent case of *Marathon Oil v. FEA,* Em.App., 547 F.2d 1140 (TECA 1976), upheld FEA authority to control the credit terms of petroleum products covered by the Allocation Act. Such credit terms had been controlled under COLC regulations, but the Allocation Act failed to expressly address them. The court nonetheless held jurisdiction over credit terms to be an implied power necessary for the FEA to fulfill its statutory functions.

The record in the present case indicates that the COLC regulations, which defined "refining" to include natural gas processing, are probative of Congressional intent. Congress undeniably intended the administration to rely on price regulations previously drafted by the COLC under Stabiliza-

---

**22.** These regulations were promulgated in 38 Fed.Reg. 22536 (August 22, 1973), as amended 38 Fed.Reg. 23794 (Sept. 4, 1973). The Allocation Act became law on November 27, 1973.

tion Act authority. Section 6(a) of the Allocation Act directed that price regulations promulgated by the COLC continue in effect unless and until modified under the Allocation Act. Moreover, Congress also intended the executive branch to draw upon mandatory allocation regulations that had been proposed by the Energy Policy Office (EPO): [23]

> "The President is specifically directed to promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil and refined petroleum products within 10 days of enactment and to make that regulation effective 15 days thereafter. In normal events, this would be an extraordinarily short time for so complex a task. Most of the work, however, has already been accomplished. The Administration has had several months experience under the voluntary program. Drafting of a mandatory program has been in progress for over two months. Moreover, in August the President published for comment a proposed mandatory allocation program of similar scope to that called for in this bill."

House Report No. 93–531 (September 29, 1973) 1973 U.S.Code Cong. and Adm.News at 2589. Congress intended for the executive branch to combine both price and allocation regulations for the petroleum industry in one administrative program.[24] COLC price regulations would be carried over under the Allocation Act and the administration could adapt within a very short time the proposals already drafted by the EPO as allocation regulations.

**23.** 38 Fed.Reg. 21797, 21802 (Aug. 13, 1973). These proposed EPO fuel allocation regulations covered "refined petroleum products and liquid petroleum gases.

**24.** By requiring that both allocations and prices be covered in the regulation required to be promulgated and implemented under Section 4(a), Congress intends to force the Administration to rationalize and harmonize the objective of equitable allocation of fuels with the objectives of the Economic Stabilization Act. The committee wishes to emphasize that the pricing controls called for in this legislation may, in those circumstances where pricing controls established pursuant to other federal authority are consistent with the requirements and objectives of this Act, merely confirm those controls

The appeals court in *Marathon Oil, supra,* found persuasive these indications of congressional intent that the Allocation Act be patterned after COLC and proposed EPO regulations. *Marathon Oil* involved a somewhat different issue in that the denotation of the jurisdictional language was not contested. Gasoline prices are indisputably covered under the Allocation Act. The parties disputed whether FEA jurisdiction over credit terms was a necessary means to effect the express jurisdiction—a question of implied powers.

In the instant case, the parties dispute the denotation of express jurisdictional language in the statute. The only implication comes from energy policy. Nevertheless, as in *Marathon Oil,* Congress in enacting the Allocation Act looked to an extent pattern of administrative regulations which treated the petroleum industry (other than natural gas) as a unit for purposes of allocation and price regulation. If an area of regulation lay clearly beyond the ambit of the Allocation Act, power formerly exercised under the Stabilization Act would lend no support to present FEA assertion of that power. When, however, the question involves an implied power, as in *Marathon Oil,* or the definition of a jurisdictional term, as in this case, administrative regulations in the same area, intended by Congress to provide a foundation for regulations under the Allocation Act, offer some indication of Congressional intent.

in the regulation to be promulgated under authority of section 4 of this Act. It is expressly contemplated, for example, that the price controls established by Phase IV under authority of the Economic Stabilization Act would continue in effect unless and until required to be modified by the price regulation required to carry out the purposes of this Act. As a matter of administrative convenience, the President may wish to continue to exercise federal pricing controls through the Cost of Living Council and may, pursuant to section 5(b), assign to that agency responsibility for administering the price controls called for in this Act.
Conference Report 93–628 (Nov. 10, 1973), 1973 U.S.Code Cong. and Adm.News at 2702.

The basic question in this case involves the scope of petroleum products subject to FEA jurisdiction. The FEA argues that crude oil and natural gas liquids form a conceptual and economic unit for purposes of regulation and that FEO and COLC regulations treated them as such. Therefore, Congress would not have looked to a pattern of regulation which, in Mobil's view, radically exceeded congressional intent to regulate only crude oil and its products.

In the court's view, the concept of petroleum products as an industry or segment of the economy to be covered by the Allocation Act is, if anything, more integral than the relationship between petroleum products and credit terms dealt with in *Marathon Oil.* It thus seems even less likely that Congress would have relied heavily on a pattern of regulation which included natural gas liquids—an entirely separate industry in Mobil's view—if Congress had not also considered natural gas liquids and crude oil inseparable for regulatory purposes. This line of reasoning, like the preceding discussion of congressional ratification, does not in itself prove the FEA's construction beyond peradventure, but it carries some incremental force against Mobil's position in this lawsuit.

## VII. Conclusion

Mobil's basic argument against FEA regulation of natural gas liquids is that construing "refined petroleum products" to include natural gas liquids would abuse the oil industry's understanding of these terms. Yet the meaning attached to these terms by Congress need not parallel that of the oil industry. Both the Senate draft and the Conservation Act amendments to the Allocation Act clearly contradicted industry usage. In this case, administrative expertise and the strong legislative policy expressed in Section 4(a) of the Allocation Act, resonating throughout the lengthy legislative history, provide a more certain key to congressional intent than the glossary of a petroleum textbook. The court cannot accept a statutory interpretation gutting that policy without more cogent evidence than Mobil has adduced. Mobil has never pointed to a single instance in the legislative history in which Congress distinguished between propane and butane from crude oil as contrasted to that processed from natural gas liquids. The reason is obvious: such a distinction is illogical and irrelevant to the allocation of scarce fuels.

The statute is, in some respects, inartfully drawn. The FEA itself informed Congress that it had encountered difficulties in controlling LPG from crude oil and LPG from natural gas liquids under the same regulations and that it had therefore promulgated separate regulations for each. Congress apparently treated LPG under the Allocation Act without much thought as to difference in sources. (The focus of Congress was on allocation of fuels, not their sources, and it probably did not advert to the different origins of the same fuel). But the intent of Congress to regulate all LPG is sufficiently clear to the court from the policy objectives of the Allocation Act. Given the clarity of the statute's goals, the court will not seize ambiguities in its provisions as a cutting edge to hamstring it.

Judgment for the defendant will be entered accordingly. Counsel for defendant will submit a judgment to the court within ten days from this date.