**SHELL OIL COMPANY,**
Plaintiff-Appellee,

v.

**FEDERAL ENERGY ADMINISTRA-
TION, an agency of the United States,
and Frank G. Zarb, Administrator,
Federal Energy Administration, De-
fendants-Appellants.**

No. 5–13.

Temporary Emergency Court
of Appeals.

Nov. 11, 1975.

Marvin L. Coan, with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., were on the brief, for defendants-appellants.

William E. Simon, Washington, D. C., with whom William E. Wickens and Frederick S. Frei, Howrey & Simon, Washington, D. C., and William G. Winters, Jr., and Albert D. Bowers, Shell Oil

Co., Houston, Tex., were on the brief, for plaintiff-appellee.

Before CHRISTENSEN, ESTES and JOHNSON, Judges.

ESTES, Judge.

Following a hearing on cross-motions for summary judgment, the United States District Court for the Southern District of Texas issued an order, August 7, 1975, which permanently enjoined the Federal Energy Administration (FEA),[1] and Frank G. Zarb, Administrator, defendants-appellants, from enforcing or attempting to enforce against Shell Oil Company (Shell), plaintiff-appellee, sections 212.101–103 of the FEA's price regulations controlling the amount which may be charged by a lessor as rent for real property used in the retailing of gasoline.[2] The regulations were held null and void as beyond the FEA's authority under the Emergency Petroleum Allocation Act of 1973, 87 Stat. 628, as amended (Allocation Act), 15 U.S.C. § 751 et seq. (1975 Supp.). The court also permanently enjoined enforcement of an FEA decision and order, *Shell Oil Company,* Case No. FER–0005 (filed 5–14–74, decided 12–10–74), 1 CCH Energy Transfer Binder ¶ 20,204, after finding the decision and order null and void insofar as it purported to control the rents charged by Shell under service station leases both during the existence of and following the expiration of the Allocation Act and insofar as it failed to permit Shell to pass through its increased costs incurred with respect to service station leases.

The critical issue in this appeal is whether the FEA may, pursuant to its authority under the Allocation Act, regulate the rent charged for real property

---

1. On December 4, 1973, the Federal Energy Office (FEO) was established under Executive Order No. 11748, 38 F.R. 33575 (Dec. 6; 1973), and the administrator of the FEO was delegated all of the authority vested in the President by (1) the Emergency Petroleum Allocation Act of 1973, 87 Stat. 628, 15 U.S.C. § 751 et seq. (1975 Supp.); (2) Section 203(a)(3) of the Economic Stabilization Act of 1970, 84 Stat. 799, 12 U.S.C. § 1904 note (1975 Supp.) as amended, insofar as it related to petroleum; and (3) the Defense Production Act of 1950, 64 Stat. 798, 50 U.S.C. App. § 2061 et seq., as amended, as it related to the production, conservation, use, control, distribution, and allocation of energy. The Chairman of the Cost of Living Council delegated further authority to the Administrator of the FEO under the Economic Stabilization Act of 1970, as amended, in Cost of Living Council Order No. 47, issued December 26, 1973, 39 F.R. 24 (Jan. 2, 1974), and Cost of Living Council Order No. 47, Amendment 1 (Jan. 30, 1974). The FEO became the Federal Energy Administration of June 27, 1974, pursuant to the Federal Energy Administration Act of 1974, 88 Stat. 97, 15 U.S.C. § 761 et seq. (1975 Supp.). All references herein will be to the FEA. See also District Court Memorandum Opinion (R. 305–321) for a thorough explanation of pertinent statutes, their legislative history, Executive Orders and background of agency regulations and orders involved. *Shell Oil Company v. F.E.A., et al.,* 400 F.Supp. 964 (S.D.Tex.1975), 3 CCH Energy Management ¶ 26,023.

2. The FEA controls the amount which may be charged by a lessor for real property used in

the retailing of gasoline under 10 CFR § 212, Subpart G, 39 F.R. 1924 (January 15, 1974), as amended, 39 F.R. 15139 (May 1, 1974), which provides:

§ 212.101

This subpart applies to each leased real property used in the retailing of gasoline where both the lessor and lessee are *refiners, resellers, reseller-retailers, or retailers,* as defined in this part. [Emphasis added]

§ 212.102

"Base rent" with respect to a lease of real property used in the retailing of gasoline means the rent charged for that station pursuant to the contractual terms prevailing on May 15, 1973.

§ 212.103

A lessor or lessee of real property used in retailing gasoline may not—

(a) increase, offer to increase, or give notice of intent to increase the rent for that real property to an amount in excess of the base rent as defined in § 212.102;

(b) increase the retailer's obligation to sell covered products to a level above that which prevailed for that retailer pursuant to the lease provisions which prevailed on May 15, 1973; or

(c) impose any operating requirements on the retailer which would be unreasonably inconsistent with the standards or goals of the Emergency Petroleum Allocation Act of 1973 or the Federal Energy Office including but not limited to a requirement that the retailer extend his hours of operation beyond his customary hours of operation.

which is used in retailing gasoline, where the lessor and lessee are "refiners, resellers, resellers-retailers, or retailers," 10 CFR § 212.101, of gasoline. The district court resolved this issue in favor of Shell in a perceptive and well-reasoned memorandum opinion and order and final judgment, entered August 7, 1975, granting Shell's Motion for Summary Judgment and denying FEA's Motion for Summary Judgment.

Under section 4(a) of the Allocation Act, the FEA was mandated to promulgate regulations for the mandatory allocation of crude oil, residual fuel oil, and refined petroleum products in amounts and at prices to be specified by the regulations. The regulations adopted under section 4(a) were to achieve "to the maximum extent practicable" *inter alia*:

> (F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users.

The mandatory limitation of rents for real property, used in retailing gasoline, to the level prevailing on May 15, 1973 for the same property, originated under Phase IV of the Economic Stabilization Program, in 6 CFR § 150.360, 38 F.R. 22536 (August 22, 1973). During the transition of authority over petroleum products from the Cost of Living Council to the FEA, the Cost of Living Council price rules were incorporated by reference in the regulations adopted by the FEA on December 27, 1973, 39 F.R. 744 (Jan. 2, 1974). On January 14, 1974, the FEA issued revised Petroleum Allocation Price Regulations, 39 F.R. 1924 (Jan. 15, 1974), which superseded the December 27, 1973 regulations. Subpart G of 10 CFR § 212, dealing with rents chargeable by lessors under the revised regulations, applied to "each leased real property used in the retailing of gasoline."

The FEA recognized that with the expiration, on April 30, 1974, of the Economic Stabilization Act of 1970, 84 Stat. 799, as amended (Stabilization Act), 12 U.S.C. § 1904 note (1975 Supp.), its authority to regulate all rents charged for any real property used in connection with retailing gasoline had ended. However, in issuing new rental regulations on April 30, 1974, 10 CFR §§ 212.101–103, 39 F.R. 15139–40 (May 1, 1974), the FEA merely narrowed the scope of its rental pricing regulation, 10 CFR § 212.101, to cover lease transactions where both the lessor and lessee were engaged in the petroleum industry as a refiner, reseller, reseller-retailer, or retailer. The FEA stated, at 39 F.R. 15139–40:

> The leasing of property used in the retailing of gasoline, between suppliers and retailers, is inextricably woven into the fabric of the supplier's marketing system and is directly related to the price at which gasoline is sold at retail. The price charged for product and the rent charged for the property, each of which is often expressed as a flat rate in cents per gallon, constitute a combined charge to the retailer by the suppliers for the purchasing and retailing of gasoline. FEO has determined that the statutory mandate to regulate the price of refined petroleum products requires the continued regulation of rents charged between retailers and suppliers in service station leases, as an integral part of its petroleum pricing regulations.

As the district court held, the legislative history of the Allocation Act shows that the authority for controlling prices of petroleum products was included in the Act solely to effectuate the FEA's allocation authority. The Senate Report stated: "[I]n the absence of such [price] regulations, the allocation program could be wholly frustrated by sellers who demanded prohibitively or exorbitantly high prices for *supplies subject to allocation*. . . ." [Emphasis added]. S.Rep.No.93–159, 93d Cong., 1st Sess. 26–

27 (1973). The House Report further clarifies the legislative intent behind the pricing authority conferred in the Allocation Act by stating:

[T]he bill would require that the mandatory allocation program determine the prices of *products* or the methods for determining equitable prices of those *products*. This has been included on the premise that it does no good to require the allocation of products if sellers are then permitted to demand unfair and discriminatory prices. [Emphasis added]

H.Rep.No.93–531, 93d Cong., 1st Sess. 12 (1973); 2 U.S.Code Cong. & Admin. News, 93d Cong., 1st Sess. pp. 2582, 2589 (1973).

 Clearly, Congress was conferring authority under the Allocation Act to regulate only the price of that which it was mandating the President to allocate. The Stabilization Act specifically provided for the regulation of prices, rents, wages, salaries, interest rates and corporate dividends. The FEA's regulations, 10 CFR §§ 212.101–103, while concededly narrowing the scope of applicability to transactions between lessors and lessees who were operating within the petroleum industry, attempt to regulate under the Allocation Act the rent chargeable for the use of real property, which the FEA has no authority to allocate.

The FEA's rent regulations, 10 CFR §§ 212.101–103, are not only beyond the scope of the agency's authority but they also fail to support the agency's own rationale for their existence. The FEA contends that these regulations prevent the frustration of its petroleum pricing regulations. But, while the rent charged by the lessor for real property used in retailing gasoline will affect the total cost of the retailer-lessee's operation, it is only when the lessor of the real property and the supplier of the gasoline to be marketed at that site are one and the same that any increase in rent could possibly be construed as a hidden increase in the price of gasoline. The rent regulations promulgated by the FEA are not limited to this situation. On the contrary, the regulation applies where a lessor of real property used for retailing gasoline is not in fact the supplier of the gasoline marketed at that location. Further, there are many items, e. g., increased real estate costs and taxes, increased property maintenance expenses, and other increased costs of doing business which would increase the cost of operating a service station and thus are just as inextricably woven into the price at which gasoline could be sold at retail from the station as rents.[3]

FEA, under its own regulations, 10 CFR § 210.62(c), prohibits "[a]ny practice which constitutes a means to obtain a price higher than is permitted by the

---

**3.** The record reflects that generally only a small portion of Shell's leased service station properties is devoted to the retail sale of gasoline. The FEA contends that it may regulate the rent on real property used in retailing gasoline due to the fact that the rent charged for such property is inextricably woven into the price charged for the gasoline marketed at the property. The FEA also contends it may regulate the rent charged for non-fuel areas of real property leased by a refiner, reseller, reseller-retailer or retailer to a similarly situated party when the rent for non-fuel areas of property used for retailing gasoline is "so inextricably intertwined with the rent for the fuel area and fuel uses as to make their separation impracticable." FEA Ruling 1974–24, 2 CCH Energy Management ¶ 16,034, at p. 16,053 (39 F.R. 28,-973, Aug. 13, 1974).

This ruling by the FEA, which superseded an earlier ruling on the same subject issued prior to the expiration of the Stabilization Act, FEA Ruling 1974–7, 2 CCH Energy Management ¶ 16,017 (39 F.R. 10434, March 20, 1974), provided with reference to a truck stop lease that where a single lease for the facilities had expired, the lessor and the lessee could enter into a new lease which provided for higher rent based on a percentage of the total sales revenue of non-fuel products. The lessor could not, however, increase the rent based on a percentage of fuel sales above that rent prevailing on May 15, 1973, nor could the lessor raise the minimum rental amount above that prevailing on May 15, 1973, unless there had been an apportionment of the minimum amount between the fuel and non-fuel areas on May 15, 1973.

regulations in this chapter. . . ." Thus, in any instance in which the FEA believes a lessor who supplies gasoline to its lessee has raised its rents as a means of obtaining a higher price for its gasoline than would otherwise be allowed, the FEA could effectively compel the lessor to substantiate the increased rentals by bringing an action to enforce 10 CFR § 210.62(c).[4]

■ The decision of the district court that the FEA's rent regulations, 10 CFR §§ 212.101–103, are beyond the authority conferred on the agency under the Allocation Act was correct. We also agree with the district court's holding that the FEA's decision and order, dated December 10, 1974, in *Shell Oil Company*, Case No. FER–0005, was null and void insofar as it purported to control either the rents chargeable by Shell under leases having effect during the existence of the Allocation Act or the rental amount or terms of Shell's leases having effect after the expiration of the Allocation Act.

The district court also invalidated the decision and order of the FEA for the reason that Shell had not been permitted to pass-through its increased costs with respect to its leased stations.[5] It is noteworthy that the FEA assumes the authority to control rents chargeable by Shell on the basis of the inextricably woven character of the rent charged a dealer with the price the dealer places on the petroleum products he sells at that station. The FEA broadly interprets its

pricing authority under the Allocation Act, yet the dollar-for-dollar pass-through provision, section 4(b)(2)(A) of the Allocation Act, according to the FEA, is not to be so broadly construed.[6] The FEA contends that rents must be controlled because their relation to the retail price at which gasoline is sold is so similar to the price of the products supplied to that dealer, while at the same time contending that the increased real estate costs incurred by lessors within the rent regulations may not be passed through because they are not in reality a product cost. Such convoluted logic will not withstand the test of reasoned analysis.

The FEA, in its appeal, has brought the court's attention to 10 CFR § 212.-82(c), which provides, according to the FEA, for the pass-through of increased real estate costs as non-product "marketing" costs under 10 CFR § 212.87(b), subject to the limitations of 10 CFR § 212.-82(d), limiting the amount by which a refiner may charge a price in excess of the base price for a covered product under 10 CFR § 212.82(c), by prohibiting a refiner from exceeding its May 15, 1973 profit margin for that product; 10 CFR § 212.87(c)(4), limiting the permissible increase in the prices of gasoline for increased marketing costs to approximately $.03 per gallon in retail gasoline sales and $.0075 per gallon in all other gasoline sales; and 10 CFR § 212.83(e)(6), prohibiting the carrying forward to any subsequent month, any increased non-

---

**4.** Pursuant to § 208 of the Economic Stabilization Act, incorporated by reference in section 5(a)(1) of the Allocation Act, 15 U.S.C. § 754(a)(1), the FEA has promulgated 10 CFR § 205.202, which provides, for each · violation of any FEA provision or order, criminal penalties up to $5000 and civil penalties up to $2500.

**5.** The District Court found that from May 15, 1973, to December 31, 1974, during which time rent chargeable by Shell for service station properties was fixed at May 15, 1973 levels, Shell's real estate costs increased by an average of 14%, with the dollar increase in costs attributable to such properties leased by Shell totaling $23,080,000. In some instances, Shell leases service station properties from a lessor

who is outside the scope of the FEA rent regulations and is thus able to increase Shell's rent while Shell must sublease the station to a retailer at a rent fixed at the May 15, 1973 level.

**6.** Section 4(b)(2) of the Allocation Act, 15 U.S.C. § 753(b)(2)(A) (1975 Supp.), provides that in specifying prices under the mandatory allocation regulation of section 4(a) of the Allocation Act, 15 U.S.C. § 753(a) (1975 Supp.), such regulation must include:

 (A) a dollar-for-dollar passthrough of net increases in the cost of crude oil, residual fuel oil, and refined petroleum products to all marketers or distributors at the retail level . . . ..

product costs calculated pursuant to 10 CFR § 212.87 which are not recouped in the month immediately succeeding the month of measurement. This results in retail service station operators who purchase petroleum supplies from Shell, but who may not be Shell lessees, bearing the burden of Shell's increased real estate costs which rightfully should be paid by the lessees of the particular property the rental cost of which has increased. Any lessee of Shell who did not purchase its supplies from Shell would then not bear any of the increased rental costs of the property from which it is operating. This makes little sense in a regulatory scheme striving for equitable pricing.

■ Furthermore, Shell contends that §§ 212.101–103 of the FEA price regulations are invalid for the reason that they were not promulgated in accordance with section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, which is incorporated by reference in section 5(a)(1) of the Allocation Act, 15 U.S.C. § 754(a)(1). This section provides for notice of proposed rulemaking by the agency and affords interested persons an opportunity to comment on and participate in the agency rulemaking. The FEA contends compliance with these procedures was unnecessary due to the uncertainty surrounding the question of whether or not the Economic Stabiliza-

tion Act would expire, by its own terms, on April 30, 1974 and the necessity of avoiding any period of decontrol over rents.

The record clearly shows that good cause for avoiding compliance with the requirements of the Administrative Procedure Act did not exist in this case. The expiration of the Stabilization Act was not so unexpected as would have precluded advance notice by the FEA of its own proposed regulations for controlling rents and accepting comments thereon prior to April 30, 1974. The FEA, by waiting until the expiration of the Economic Stabilization Act to issue its own regulations controlling rents, effectively compelled interested parties to bear the burden of compliance with the regulation and the time and expense of litigation in order to comment in any meaningful way on the FEA's promulgation of rent regulations under the Allocation Act's authority. Finding that no circumstances exist justifying a failure to comply with section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, we conclude that the challenged regulations are invalid. *Nader v. Sawhill,* 514 F.2d 1064 (TECA 1975); *Consumers Union v. Sawhill,* 393 F.Supp. 639 (D.D.C.1975), 3 CCH Energy Management ¶ 26,017, *aff'd Consumers Union v. Zarb,* 523 F.2d 1404 (TECA 1975).[7]

The judgment of the trial court was right and it is affirmed.

7. The government contends that the admonition in *Nader v. Sawhill,* 514 F.2d 1064, 1069 (TECA 1975), against "repeated technical noncompliance" with 5 U.S.C. § 553 should be prospective only and that it is not relevant as to regulations promulgated prior to that decision. While the issue of FEA's compliance was not deemed determinative in *Nader* because of its peculiar circumstances, it is a basic problem posing a crucial issue in this case. In *Consumers Union v. Sawhill,* 393 F.Supp. 639 (D.D.C.1975), 3 CCH Energy Management ¶ 26,017, the district court struck down regulations promulgated by the FEA prior to this court's decision in *Nader,* due to the failure of the FEA to comply with the pertinent provisions of the Administrative Procedure Act. This court on September 19, 1975 affirmed the district court's action. *Consumers Union v. Zarb,* 523 F.2d 1404 (TECA 1975).

The FEA proposed certain modifications to its challenged rent regulations on September

30, 1975 (40 F.R. 47,147–149, Oct. 8, 1975), after the district court in this case found the FEA's rent regulations beyond the statutory authority of the agency. As modified, the FEA rents provision would specifically limit the scope of its coverage to situations where a lessor is also the supplier of gasoline to its lessee. Without regard to the validity of the proposed regulations, this action by the FEA certainly indicates the wisdom of providing full opportunity for participation by the public in agency rulemaking in accordance with the Administrative Procedure Act. Had Shell and other interested parties been able to comment on the FEA rent regulations at issue herein prior to their promulgation on April 30, 1974, the authority of the agency to regulate rents, and the scope of that authority over non-fuel areas and non-supplier lessors could have been more closely examined at a time when interested parties' rights and obligations had not yet been affected.