The STANDARD OIL COMPANY, an Ohio Corporation, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION, an agency of the United States of America, Frank G. Zarb, Administrator, Federal Energy Administration, Gorman C. Smith, Acting Assistant Administrator, Operations, Regulations and Compliance, Federal Energy Administration, Melvin Goldstein, Director, Office of Exceptions and Appeals, Federal Energy Administration, Defendants,

and

United States of America, Counterclaimant.

No. C75–179.

United States District Court, N. D. Ohio, E. D.

Nov. 20, 1978.

---

George J. Dunn, Charles F. Clarke and B. Casey Yim Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff.

Solomon Oliver, Jr., and Donald D. Weisberger, Asst. U. S. Attys., Cleveland, Ohio, Irving Jaffe, Acting Asst. Atty. Gen., Lenore Garon, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On February 20, 1975 plaintiff filed the above-captioned appeal from an administrative remedial order. In its complaint The Standard Oil Company of Ohio (Sohio) alleges that the Federal Energy Administration's (FEA) remedial order of September 20, 1974 exceeded the scope of FEA's authority. Sohio seeks injunctive and declaratory relief. Counterclaimant United States of America seeks civil penalties from Sohio pursuant to Section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 754(a)(1).

Subject matter jurisdiction is based upon Section 7(i)(2)(B) of the Federal Energy Administration Act (FEAA) and 28 U.S.C. § 1337. Venue in this district is proper. 28 U.S.C. § 1391(e). It is undisputed that Sohio exhausted its administrative remedies by appealing the remedial order of September 20, 1974 to FEA's Office of Exceptions and Appeals. (Plaintiff's Exhibit C). On January 30, 1975 the remedial order was affirmed by FEA's Office of Exceptions and Appeals.

On November 18, 1976 cross motions for summary judgment were filed to which briefs and affidavits were attached. On December 28, 1976 Sohio filed a brief opposing FEA's motion for summary judgment and on December 29, 1976 FEA filed its brief opposing Sohio's motion for summary judgment. Because the facts are not in dispute, it is proper to decide the case by summary judgment. See, e. g., *Felix v. Young*, 536 F.2d 1126 (6th Cir. 1976); *United States v. Articles of Device Consisting of Three Devices . . . "Diapulse"*, 527 F.2d 1008 (6th Cir. 1976).

### I.

In 1972 crude oil became scarce in the United States. In 1973 the production of crude oil by exporting countries failed to keep pace with the rapidly increasing demand of the industrialized nations. The resultant shortages encouraged the exporting countries to gradually increase their posted crude oil prices. In October of 1973 the Organization of Petroleum Exporting Countries (OPEC) increased the posted price of crude oil from approximately $3.00 per barrel to approximately $6.00 per barrel. Moreover, on October 12, 1973 the Arab exporting countries imposed an embargo on crude oil shipments to the United States and to other industrialized oil importing countries which they did not lift until April, 1974. The embargo further limited the world supply of oil, causing market prices to rise above the OPEC levels. In November and December, 1973 OPEC raised oil prices to approximately $11.00 per barrel. Again, market prices rose higher than the OPEC levels because of the embargo and because many of the industrialized nations were willing to pay a premium for clean-burning low sulfur "sweet" crude oil.

Sohio is an independent refiner of petroleum products. Until domestic crude oil became scarce, Sohio had purchased the crude oil it required from domestic producers. During the period May, 1973 through February, 1974, however, Sohio supplied its refineries with a mixture of foreign and domestic crude oil. Sohio's accounting of two types of transactions used by it to supply its refineries during this period is at issue in this case. Both types of transactions are arms-length transactions in which the crude oil Sohio purchased from independent sellers was shipped by independent carriers.

The first type of transaction is a "time-trade exchange." A time-trade exchange is a transaction in which a company needing oil to meet present customer demands receives oil from a second company; simultaneously promising that second company to repay it in the future by delivering oil of a similar quality and quantity.

During the period May, 1973 through December, 1973 Sohio needed crude oil to preserve its market. By exchange transaction, Sohio acquired approximately a million and one-half barrels of "sweet" domestic crude oil from an independent supplier. The exchange agreement required Sohio to deliver an equal amount of "payback" oil—crude

oil of similar grade—to the independent supplier during the first quarter of 1974. Due to the shortage of domestic sweet crude oil, Sohio intended to make its repayment deliveries by purchasing sweet foreign crude oil from a third party on the open market. Accordingly, Sohio contracted in September, 1973 with a foreign oil company from which it acquired the payback oil in 1974 at the then prevailing price of foreign sweet crude oil.

Until October, 1973 Sohio booked at $4.81 the cost of the sweet crude oil it acquired pursuant to the exchange transactions. However, the price of foreign oil increased. Concurrently, Sohio increased the book cost of the exchange oil pursuant to generally accepted accounting principles to reflect the prevailing price of the foreign sweet crude oil—the price that Sohio would be required to pay in 1974 for the foreign repayment oil. These prices ranged from $8.55 per barrel in October, 1973 to $12.62 per barrel in November and December, 1973.

Sohio's accounting of outright purchases of domestic crude oil from independent domestic suppliers is also contested in this administrative appeal. Like the direct-time exchange, this second type of contested transaction occurred during the last quarter of 1973 and the first quarter of 1974.

On August 19, 1973, the Cost of Living Council (CLC) adopted mandatory petroleum pricing regulations.[1] These regulations were promulgated under the Economic Stabilization Act of 1970, as amended 12 U.S.C. § 1904 note, and Phase IV of the Economic Stabilization Program. CLC's crude oil price controls were designed (1) to curb inflation, and (2) to increase declining domestic production by providing financial incentives.

The CLC Stabilization Program imposed a two-tier pricing system on domestic crude oil. However, only domestic wells producing crude oil in 1972 were subject to the two-tier system. Wells producing at or below their 1972 levels were said to produce "old" oil. Old oil was subject to a ceiling price equal to the highest posted crude oil price of that well on May 15, 1973, plus $.35 per barrel. Crude oil produced from post-1972 wells, or from an older well producing in excess of its 1972 production level, was "new" oil. New oil could be sold at uncontrolled prices. Furthermore, a barrel of old oil was "released" from price controls for each barrel of new oil produced from a well that was producing in 1972.[2]

Sohio's suppliers of domestic oil were unable to certify the proportions of "new," or "released" oil, versus "old" oil in each delivery at the time of the delivery. Sohio often waited up to five months from the delivery date for a supplier's written certification of the content of a domestic crude oil delivery. In the interim Sohio accrued on its books each month a cost of domestic crude oil based on Sohio's estimate of the old-new proportion of each delivery; the estimates were based on industry-wide production records. Furthermore, Sohio refined and sold all or part of the domestic deliveries, incurring manufacturing, distribution, selling and overhead expenses during the five month intervals.

## II.

In December, 1973 the Federal Energy Office (FEO) assumed the petroleum pricing authority of the CLC.[3] On January 14, 1974, the FEO recodified the CLC's Phase IV Petroleum Price Regulations without

1. 6 C.F.R. Part 150, Subpart L, 38 Fed.Reg. 22356 (August 22, 1973).

2. Production from "stripper wells," properties producing ten barrels per day or less, was exempted from price controls. *Neuman Affidavit*, ¶ 14.

3. On November 27, 1973 the President established the FEO pursuant to his authority under the Emergency Petroleum Allocation Act

(EPAA), 15 U.S.C. § 751 *et seq.* *See* Exec. Order No. 11,748, 38 Fed.Reg. 33575 (December 6, 1973).

The FEO became the Federal Energy Administration in June, 1974. Exec. Order No. 11790, 39 Fed.Reg. 23185 (June 27, 1974). The Federal Energy Administration Act of 1974 (FEAA), 15 U.S.C. § 761 *et seq.* became law on May 7, 1974. Pub.L.No.93–275, 88 Stat. 97.

amendment.[4] Therefore, both the CLC's Phase IV petroleum price regulations and the FEO recodification were effective during the period of the contested transactions.

The applicable regulations imposed ceiling prices on Sohio and other refiners.[5] The regulations permitted refiners complete discretion to charge a particular class of purchasers a price at or below the refiner's "base price." Base price was defined as the sum of (1) the weighted average price charged to the same class of purchasers on May 15, 1973, and (2) the increased product costs incurred between the month of measurement and the month of May, 1973. 10 C.F.R. § 212.83(f), 39 Fed.Reg. 1953 (January 15, 1974). Accordingly, a refiner's base price changed because once each month a refiner could increase its selling price for the following month to reflect increased product costs (i. e., the increased costs of imported crude oil and the increased cost of domestic crude oil) it incurred in the preceding month, the "month of measurement." Thus, a refiner's profit margin was frozen at its May 15, 1973 level, but a refiner could pass through its product cost increases on a dollar-for-dollar basis by charging a selling price equal to the base price in the month following the month in which the increased product costs were incurred.[6] Moreover, product cost increases that were not recovered in the current month, because of competitive market conditions, could be "banked" for use in determining base prices for subsequent months.[7]

In November and December of 1973 and January of 1974 Sohio passed through, as incurred increased product costs, the cost of the foreign payback oil to be purchased in 1974 that Sohio had accrued on its books during October, November, and December of 1973. Similarly, in the month following delivery Sohio passed through, as incurred increased product costs, costs of domestic crude oil based upon its estimated proportion of old to new domestic oil.

The issue in this case is the meaning of the term "incurred" in the following regulation:

*Base price*—(1) General rule (i) The base price for sales of an item by a refiner is the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus (a) increased product costs *incurred* between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 212.83. . . . 10 C.F.R. § 212.82(f)(1), 39 Fed.Reg. 1953 (FEO: January 15, 1974) (emphasis added).

In its remedial order of September 20, 1974 the FEA announced its decision that (1) the cost of the direct exchange transactions was not "incurred," and therefore not an allowable pass-through cost, until Sohio purchased the foreign payback oil in 1974, and (2) the cost of Sohio's domestic crude was not "incurred," and not available for pass-through, until Sohio received written confirmation from each domestic supplier of the ratio of "new" and "released" crude to "old" crude. On January 30, 1975 Sohio's appeal of the FEA Remedial Order was denied by the FEA Office of Exceptions and Appeals. This court finds that the Remedial Order of

4. 39 Fed.Reg. 1952 (January 15, 1974). FEO also renumbered the regulations. Those governing refiners, such as Sohio, appeared at 10 C.F.R. Subpart E.

In September, 1974 FEA announced a "comprehensive revision" of the petroleum price regulations. 39 Fed.Reg. 32720 (September 10, 1974). FEA adopted amended regulations that became effective December 1, 1974. The December, 1974 rulemaking is not, however, applicable in this case.

5. Phase IV: 6 C.F.R. § 150.358, 38 Fed.Reg. 22541 (August 22, 1973). FEO: 10 C.F.R. § 212.82, 39 Fed.Reg. 1954 (January 15, 1974).

6. The regulations also authorized the pass-through of increases in non-product costs subject to certain limitations. 10 C.F.R. § 212.-83(b), (c), 39 Fed.Reg. 1952 (January 15, 1974). *See also Standard Oil Co. v. Federal Energy Administration,* 453 F.Supp. 203 (N.D.Ohio 1978); *Phillips Petroleum Co. v. Department of Energy,* 449 F.Supp. 760 (D.Del.1978). Non-product cost increases are not at issue in this action.

7. 10 C.F.R. § 212.83(c), 39 Fed.Reg. 1924 (January 15, 1974):

September 20, 1974 exceeds the scope of FEA's authority.

As the quotation from § 212.82(f) states, the definitions in § 212.83 provide the measure of increased product costs. Although the amount of product cost increases is defined in § 212.83, that section does not define "incurred."

In the direct exchange transaction, Sohio received foreign crude oil. Section 212.-83(b)(2) defines cost of imported crude petroleum as its "landed cost." Landed cost means:

> (1) For purposes of complete arms-length transactions, the purchase price at the point of origin plus the actual transportation costs. (2) For purposes of products purchased in arms-length transactions and shipped pursuant to a transaction between affiliated entities, the purchase price at the point of origin plus the transportation cost computed by use of the accounting procedures generally accepted and consistently and historically applied by the firm concerned. (3) For purposes of products purchased in a transaction between affiliated entities and shipped pursuant to an arms-length transaction, the cost of the product computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned plus the actual transportation cost. (4) For purposes of products purchased and shipped pursuant to a transaction between affiliated entities, the costs of the product and the transportation both computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned. 10 C.F.R. § 212.83(b), 39 Fed.Reg. 1955 (January 15, 1974).

It is uncontested that of the four definitions of landed cost only subsection (1) applies to Sohio's arms-length direct exchange transaction. Subsection (1), unlike subsections (2)-(4), does not limit a refiner to his "customary accounting procedures generally accepted and consistently and historically applied . . . ." Defendants argue that because a refiner is only directed to use his

customary accounting procedures to assess the cost of imported crude oil in transactions between affiliates, independent refiners such as Sohio are precluded by this regulation from using their normal accounting procedures to record arms-length foreign transactions. In other words, FEA argues by negative inference that Sohio was precluded from using its normal accounting system in the direct exchange transactions undertaken between April and December, 1973. The court is not persuaded by defendant's argument.

■ In *Tobin v. Edward S. Wagner Co.,* 187 F.2d 977 (2d Cir. 1951), the Second Circuit Court of Appeals stated its view of regulatory construction:

> [R]egulations, precisely because they particularize, ought not be as generously interpreted as the statute. In fairness to the regulated, *the provisions of the regulations should not be deemed to include what the administrator, exercising his delegated power, might have covered but did not cover.* True, in deciding what they do cover, we must not regard their literal terms merely, but must also give much weight to administrative interpretive rulings which have been published and of which the regulated are thus on notice. 187 F.2d at 979 (emphasis added).

There is no question that the CLC and the FEO "might have, but did not cover" accounting procedures for recording and reporting arms-length landed costs in § 212.-83(b)(1). Moreover, there are no published administrative interpretations adopting FEA's negative inference interpretation of landed cost. Finally, landed cost definitions 2–4 reflect FEA's admitted concern that, between affiliates, "paper" costs could be fabricated thereby unjustifiably increasing the product costs passed through to consumers:

> FEA regulations have always recognized that multi-national oil firms have an incentive to maximize the profitability of their foreign operations for income tax or other legitimate business reasons by maintaining transfer prices charged to their domestic affiliates as high as possi-

ble. Since this can result in excessive costs being available for pass-through to consumers under FEA's mandatory price control program, FEA and its predecessor agencies have consistently reserved the right to reallocate landed costs computed by use of a firm's customary accounting procedures . . . (FEA Answer to Plaintiff's First Interrogatory No. 5(a).) Accordingly, this court finds that the accounting restrictions in the definition of landed cost were promulgated to limit the amount of foreign product costs claimed as a result of transactions between affiliates and that they do not apply to foreign product costs incurred in arms-length transactions.

Similarly, the applicable portion of § 212.-83(b) defines the cost of domestic crude oil, "in arms-length transactions, [as] the purchase price." Again, there is no statement in the petroleum pricing regulations of when the cost of domestic petroleum is "incurred" for purposes of base price pass-through.

■■■ It is uncontested that FEA's crude oil regulations do not define "incurred" vis-a-vis arms-length transactions. Consequently, FEA's September 20, 1974 Remedial Order represents an interpretation of § 212.82(f). The standard of review of interpretations of administrative regulations is strict:

> Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulations *if the meaning of the words used is in doubt.* . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

*Accord, Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Compton v. Tennessee Dept. of Public Welfare,* 532 F.2d 561, 565 (6th Cir. 1976). In the present case the meaning of the word "incurred" in § 212.82(f) is "in doubt." The

court finds that FEA's interpretation of § 212.82(f) is inconsistent with the regulation and that FEA exceeded the scope of its authority.

In its Remedial Order FEA interpreted § 212.83 as follows:

> Under that section *only known costs* of crude petroleum *actually incurred* in a month of measurement may be included in the calculation of increased product costs available for recovery in a current month. (Exhibit A, p. 1) (emphasis added).

At the administrative level, and before this court, FEA has argued that because actual costs were unknown until payback oil was delivered in 1974 and until approximately five months after delivery of the Sohio domestic crude supplies, product costs were not incurred by Sohio in the relevant transactions until the amount of the cost was known and payable. The court disagrees with that argument. A cost is normally incurred, regardless of amount, when a reciprocal obligation to pay for the item received arises. That this is the normal meaning of incurred appears to have been recognized in FEA's present definition of "import fees and duties incurred":

> "Import fees and duties incurred" means only import fees and duties that are paid by or on behalf of the firm purchasing the product and that are in addition to the purchase price of the product, and does not include any import fees and duties paid by or on behalf of firms other than the purchasing firm, such import fees and duties that are already reflected in the price charged for a product *import fees and duties are "incurred" (for purposes of determining increased product costs)* at the time the product is released from U. S. customs custody or entered into U.S. customs territory, or withdrawn from a bonded warehouse or consumption, whichever occurs first, *even though payment of the fees or duties may be at a later date.* § 212.82. (emphasis added).

This regulation indicates FEA's recognition that the amount of a cost is different from

incurring a cost, and that costs are normally incurred before they are paid.

In the relevant transactions Sohio incurred raw material product costs before the amount of the costs was known because crude oil was delivered to Sohio for refining before Sohio delivered the payback oil or paid its domestic suppliers. That these costs were unknown and unpaid does not negate the fact that Sohio had incurred the costs because incurring a cost is a different concept than determining the amount of that cost. As written, § 212.82(f) requires only that a cost be incurred before pass-through, not that the cost be known *and* incurred. Therefore, FEA's attempt to en-graft a known cost requirement upon the entirely different concept of incurred cost has resulted in an FEA interpretation that is inconsistent with the meaning of § 212.-82(f).

FEA has also argued that its scheme of petroleum price regulation implicitly al-lowed refiners to pass through only known costs when payable. To establish that So-hio should have inferred that product cost increases could only be passed through when known, FEA must show that that requirement is the only reasonable interpre-tation of its regulations. *Phillips Petrole-um Co. v. Department of Energy*, 449 F.Supp. 760, 780 (D.Del.1978); *Sampson v. Clark*, 162 F.2d 730, 733, 735–36 (Em.App. 1947). *Cf. United States v. Chicago Black-hawk Hockey Team, Inc.*, 468 F.2d 221 (T.E. C.A.1972) (court refused to imply an exemp-tion to a clear regulatory provision, al-though the absence of an exemption may have led to an unintended result). This subsumes a secondary issue: whether the regulations could be construed to permit pass through of direct exchange product costs and domestic product costs before pay-back and invoicing respectively.

In its petroleum price regulations the only restriction FEA placed on the pass-through of increased product costs was the that these costs be incurred. The uncontro-verted Popeney and Maxwell affidavits in-dicate that during the relevant period ac-crual accounting was the universally accept-ed accounting procedure among refiners. Popeney Affidavit, ¶ 4; Maxwell Affidavit, ¶ 5. It is also uncontroverted that Sohio's recording of the direct exchange transac-tions as an incurred cost prior to Sohio's delivery of "exchange oil" in 1974 and its recording of the domestic shipments it re-ceived as an incurred cost prior to receipt of a delayed invoice are consistent with gener-ally accepted accrual accounting procedure. Popeney Affidavit, ¶ 7; Maxwell Affidavit, ¶ 5. This court must assume that uncontro-verted affidavits submitted to it are true. *Fitzke v. Shappell*, 468 F.2d 1072, 1077 (6th Cir. 1972). Accordingly, the court finds that FEA regulations could reasonably have been interpreted by refiners to permit their pass-through of product costs as incurred product costs when crude was available for refining. Thus, FEA's argument that So-hio's contested pass-throughs were preclud-ed by implication of the FEA regulatory scheme is not persuasive.

By this decision, the court does not address itself to the issue of whether an FEA regulation limiting pass-through of product costs to known costs when payable would be beyond the scope of FEA's statu-tory mandate. Clearly, the validity of such a regulation would be judged by a different standard than that applied here to scruti-nize an agency interpretation of existing regulations §§ 212.82 and 212.83. See, e. g., *Shell Oil Co. v. Federal Energy Administra-tion*, 527 F.2d 1243 (T.E.C.A.1975). More-over, FEA has argued that its remedial order should be upheld because "great def-erence" should be accorded FEA's expertise. Had FEA defined "incurred," or restricted the use of normal accounting procedures in domestic and foreign arms-length transac-tions, deference to such quasi-legislative agency decisions would be appropriate. See, e. g., *Saint Francis Memorial Hospital v. Weinberger*, 413 F.Supp. 323, 333 (N.D. Calif.1976). However, FEA made no such conscious choices. As the court noted in the analogous case of *Saint Francis Hospital*:

The Medicare Act conferred on the Secre-tary the authority and duty to promul-gate regulations governing reimburse-

ment of providers of medical services. *He could not fulfill that duty by enacting ambiguous regulations through the proper procedure and then "clarifying" them behind closed doors thereafter.* 413 F.Supp. at 330 (emphasis added).

Because FEA's Remedial Order of September 20, 1973 and its affirmance of that order on January 30, 1973 are inconsistent with promulgated FEA regulations, Sohio's motion for summary judgment is granted.

IT IS SO ORDERED.