August P. ROSSI, Jr., and Douglas J.
Siemer,
**Plaintiffs-Appellees-Appellants,**

v.

**MOBIL OIL CORPORATION,**
**Defendant-Appellant-Appellee.**

Nos. 9–65, 9–67.

Temporary Emergency Court of Appeals.

Argued Jan. 7, 1983.

Decided June 2, 1983.

David Laufer (argued), Shapiro, Laufer, Posell & Close, Los Angeles, Cal., with whom on brief were Kenneth P. Roberts and John C. Gorman, Los Angeles, Cal., for Rossi and Siemer.

James A. Magee (argued), Donovan, Leisure, Newton & Irvine, Los Angeles, Cal., with whom on brief was Peter J. Courture, Los Angeles, Cal., for Mobil Oil Corp.

Before JAMESON, DUNIWAY and ZIRPOLI, Judges.

DUNIWAY, Judge:

In No. 9–65, Mobil Oil Corporation appeals from a judgment for Rossi and Siemer, based upon a partial summary judgment establishing liability and upon the verdict of a jury fixing damages. In No. 9–67, Rossi and Siemer appeal from the judgment and order denying a new trial. We affirm in both appeals.

## I. BACKGROUND.

### A. *The Facts.*

Plaintiffs Rossi and Siemer, doing business as a general partnership, leased from Mobil a retail motor gasoline service station in Costa Mesa, California. Their second three-year lease was to expire December 31, 1976, and pursuant to the lease Mobil gave notice that it would not renew. Negotiations for a new lease failed, but Rossi and Siemer did not vacate the premises. On April 19, 1978, Mobil brought an unlawful detainer action in Orange County Superior Court. That court entered a judgment on January 20, 1981 that Rossi and Siemer had been in unlawful possession of the service station since the lease expired on January 1, 1977. The judgment was stayed pending appeal, however, and on December 17, 1982, the California Court of Appeal reversed the judgment in favor of Mobil. *Mobil Oil Corp. v. Rossi,* 138 Cal.App.3d 256, 187 Cal. Rptr. 845 (1982).

Mobil had been delivering gasoline and other petroleum products to Rossi and Siemer at the station under a Retail Dealer Contract. Mobil stopped deliveries in March 1978, with neither the consent of Rossi and Siemer nor the approval of the Department of Energy. Rossi and Siemer asked the Department on April 28, 1978, to order Mobil to resume deliveries and on June 19, 1979, the Department issued a Decision and Order requiring Mobil to deliver withheld supplies and to continue supplying Rossi and Siemer in the future. The Federal Energy Regulatory Commission affirmed that order on August 7, 1980. Mobil has not brought a separate action attacking that decision.

While the agency action was pending, Rossi and Siemer opened another legal front by suing Mobil in federal district court for the Central District of California on June 13, 1979. They asked the court for damages and an injunction requiring Mobil to resume regular deliveries and to provide, as well, all the gasoline that it had withheld from them since March 1978. The district court granted the injunction on September 19, 1979, modifying it on October 1 by delet-ing the requirement that Mobil turn over to the retailer all the products it had withheld in past months. The court held for Rossi and Siemer on cross motions for summary judgment on October 30, 1981, and a jury awarded damages of $162,000.

### B. *The Law.*

The Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.,* and regulations under it, 10 C.F.R. Part 211 (1977), since expired, required Mobil, subject to various conditions, to allocate and deliver petroleum products to each operator of a retail outlet to whom it sold gasoline during each corresponding month in 1972. 10 C.F.R. § 211.9(a) (1977). The parties do not dispute that they were subject to what the regulations term a supplier/wholesale purchaser-reseller relationship, § 211.9(a)(2)(i), or that Mobil's obligation to deliver gasoline supplies to Rossi and Siemer was regulated by the Act and the regulations. Those regulations provide that Mobil could stop deliveries to Rossi and Siemer only if the Department approved in writing, § 211.-9(a)(2)(i), or if Rossi and Siemer went out of business, within the meaning of §§ 211.-11(c) and 211.106(c). Because the Department did not approve Mobil's cut-off of product deliveries to Rossi and Siemer, the legality of the termination is governed by § 211.11(c). The operator of a retail sales outlet "shall be deemed to have gone out of business with respect to that outlet for purposes of § 211.11 if it vacates the site on which it conducts such business." 10 C.F.R. § 211.106(c)(1).

In the administrative proceedings, Mobil had argued that a supplier could stop deliveries when it reasonably believed that the retailer unlawfully occupied a retail outlet, because, by its unlawful occupation, the retailer is deemed to have gone out of business. The Department and Commission and the district court held that a supplier could not terminate deliveries to a retailer it believed to be in unlawful possession, but could be compelled by the Department to continue deliveries until a state court holds the retailer's occupancy to be unlawful. The district court relied on the Department

and Commission orders that held Mobil to be in violation of § 211.11(c). It found that those orders did not exceed the agencies' authority and were supported by substantial evidence.

## II. ESTOPPEL AND JOINDER.

Rossi and Siemer argue preliminarily that this court should not hear Mobil's appeal because (1) Mobil is collaterally estopped by its failure to challenge the Department and Commission orders directly under § 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, and (2) Mobil has not joined the Department as a party to this action.

### A. Collateral estoppel.

■ Section 5(a)(1) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(1), incorporated by reference § 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, providing for direct judicial review of orders issued under the Allocation Act's authority. Section 210, 12 U.S.C. § 1904 note, permits private suits such as this one by persons claiming injury from any act or practice arising out of the Allocation Act. District courts have jurisdiction to hear suits brought under either section. Rossi and Siemer argue that because Mobil did not mount a direct attack under § 211 upon the Commission's order affirming the Department's finding of an Allocation Act violation, Mobil is estopped from contesting that finding in this proceeding.

"Offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore,* 1970, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 649 n. 4, 58 L.Ed.2d 552. We have held that where administrative proceedings "deal with specific issues between designated parties in enforcement or other determinative proceedings, ... the prevailing rule is that administrative determinations may be given collateral estoppel effect between the parties and their privies if they are the result

of fair adversary hearings and are supported by substantial evidence ..." *Atlantic Richfield Co. v. Federal Energy Administration,* 556 F.2d 542, 549 (Em.App.1977). Collateral estoppel should not attach, however, "when it is sought to be applied in an essentially different context" from the original proceeding. *Id.* at 550.

Neither party has directed our attention to a statute or rule fixing the time within which an action attacking a Commission order must be filed under § 211. *Cf.* 42 U.S.C. § 7193(b), setting time limit for appeal from a Department order to the Commission. Mobil does not argue that the Commission order against it is not yet final and not subject to attack under § 211, but does argue that collateral estoppel does not bar it from defending against Rossi and Siemer's § 210 action because (1) the issues and facts in the two proceedings are not identical; (2) it would be inequitable to require Mobil to have brought a separate § 211 action attacking the Commission order because it became subject to attack while the § 210 district court proceeding concerning the same Department interpretation was pending and at a time when the district court had already ordered Mobil to resume deliveries to Rossi and Siemer; (3) a separate § 211 action would have contradicted "traditional notions of judicial economy" and been a "meaningless duplication of actions"; and (4) Mobil is not challenging a finding of fact by the Department but a conclusion of law.

The district court held that Mobil was "not estopped from challenging the validity of the interpretation given to the regulations" in the final Commission order because Mobil was not strictly challenging the validity of the remedial order and the relief it granted, but was "attempting to avoid the extension of liability to include money damages." District Court Conclusions of Law at 7. Alternatively, the court held that a "separate proceeding for the sole purpose of judicial review would raise issues identical to those raised in this proceeding, and would therefore be unnecessarily duplicative." *Id.*

Without retreating from our approval of offensive collateral estoppel in *Atlantic Richfield,* we nevertheless find Mobil not barred by that principle here. *See Parklane Hosiery, supra,* 439 U.S. at 331, 99 S.Ct. at 651, granting trial courts broad discretion to determine when offensive collateral estoppel should be applied. As we explain below, we do not agree with the district court that Mobil's appeal cannot be considered an attack on the validity of the Department and Commission orders. But the Commission order became effective August 7, 1980, after the district court had issued the injunction directing Mobil to resume deliveries to Rossi and Siemer, and while the parties were preparing for trial. Because the issues there would be the same as in a concurrent § 211 proceeding, and because Mobil could have filed a § 211 action in the same district court, we hold that Mobil is not collaterally estopped from attacking the Department or Commission orders here.

### B. *Joinder of the Department.*

 Rossi and Siemer next argue that Mobil may not attack the district court's decision upholding the Commission order without joining the Department. They contend that the agency should be given the opportunity to defend its reasoning because "Rossi and Siemer obviously do not possess the necessary expertise to defend the [Department's] decision-making authority." Appellee's Response Brief (filed Sept. 2, 1982) at 11–12.

This court was created by § 211(b) of the Economic Stabilization Amendments of 1970, Pub.L. No. 92–210, 85 Stat. 743, 749, approved December 22, 1971. A little over a year later, we decided *Associated General Contractors of America, Inc. v. Laborers International Local 612,* 476 F.2d 1388 (Em.App.1973). There, we required the joinder of administrative agencies in an action challenging their decision, even though none of the parties had requested joinder. It was an action for a declaratory judgment upholding a labor contract that the agencies had refused to approve. In our opinion, we hinted strongly that the agencies' actions

were unlawful, *id.* at 1399–1400, 1405. We then said:

> To further breathe life into the legal system with which we are concerned ... [w]e hold that in the absence of equivalent representation or other extraordinary circumstance which we cannot now anticipate no order of an economic stabilization program agency should be mandated or subjected to invalidation in any judicial proceedings unless that agency has been made party to such proceedings.

*Id.* at 1407.

When we decided that case, both we and the stabilization agencies were feeling their way, and we felt strongly that, even in what appeared to us to be a clear case of invalidity of an agency order, the agency should be a party, lest we be led astray. By 1979, we had learned a good deal, and so had the Department and the Commission. In that year we decided *Dyke v. Gulf Oil Corp.,* 601 F.2d 557 (Em.App.1979).

The action was for overcharges in the sale of gasoline, and the Department was joined as a party. It asked to be dismissed, and when its motion was denied, we granted an interlocutory appeal. We reversed. In an opinion by Judge Christensen, who also wrote the opinion in *Associated General Contractors,* we said:

> The question of the joinders of the DOE in these cases was not set at rest by our decisions in *Longview Refining Co. v. Shore,* 554 F.2d 1006 (Em.App.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Air Products and Chemicals, Inc. v. United Gas Pipe Line Co.,* 503 F.2d 1060 (Em.App.1974); and *Associated General Contractors of America, Inc. v. Laborers International Local 612,* 476 F.2d 1388 (Em.App.1973).

601 F.2d at 562. As to *Associated General Contractors,* we said:

> [T]he object of joinder in that case was not to gratuitously constrain the agency but to seek its expertise and insight in [a] limited context....

*Id.* at 563. We expressed similar views about *Air Products* and *Longview. Id.*

It is reading altogether too much into [*Longview*] to suggest that its description of the agency's powers indicated that those powers necessarily were to be exercised in purely private litigation, much less that the agency should be generally joined as a party to such litigation for that or any other purpose.

*Id.* We listed a number of reasons why joinder of the agency should not be required and pointed out that under Rule 24(b), Fed.R.Civ.P., intervention by the agency, at its request, could be permitted. *Id.* at 567–568. We concluded:

> The salutary rule of deference of courts to agency decisions should not be distorted to become a rule of unreasonable judicial dependence upon agency joinder in private cases generally. Footnote omitted.

We did, however, leave the door open to joining the agency when its order is under attack. *Id.* at 568. However, we do not read the *Dyke* opinion as *requiring* that the agency be joined in every such case.

In the present case, Mobil asserts that its position "does not require invalidation of an agency order." Reply brief, p. 7. We find this position astonishing in the light of Mobil's opening brief which contains a "Point II" headed as follows:

## THE REMEDIAL ORDERS ISSUED BY THE DOE AND FERC AND UPON WHICH THE DISTRICT COURT RELIED ARE IMPROPER.

The brief then proceeds to argue that the orders are "Arbitrary and Capricious," "Beyond The Agency's Authority," and "Not Supported by Substantial Evidence."

However, the fact that Mobil does attack the Department's orders does not persuade us that, in this case, we should reverse for failure to join the Department as a party. This is not a case, like *Associated General Contractors,* in which we incline to the view that the orders are invalid, but are reluctant to so hold without having the agency before us. Moreover, here the orders are attacked only in part; Mobil has complied, albeit reluctantly, since September 19, 1979,

and does not now attack the injunction that required it to do so. The question presented is neither complex nor difficult. The program no longer exists. Surely it is in the interest of both parties that this litigation be not prolonged unnecessarily. We are directed by the Act which created us "to exercise [our] powers ... in such manner as to expedite the determination of cases...." *See Marine Petroleum Co. v. Champlin Petroleum Co.,* 657 F.2d 1231, 1245 (Em.App. 1980). *See, also, Bulzan v. Atlantic Richfield Co.,* 620 F.2d 278 (Em.App.1980), holding that the issuance of a remedial order by the Department is not a bar to an action by a buyer against his supplier under § 210 for damages for violation of the regulations. There, we emphasized the difference between the parties to the two proceedings, the remedies afforded, and the purposes served. The same considerations are involved here. In *Bulzan,* we cited *Dyke* for the proposition that "the [Department] cannot be required to be a party to a private suit under section 210, unless there are compelling circumstances which necessitate the agency's involvement." 620 F.2d at 282–283. We find no such circumstances here.

### III. THE DEPARTMENT AND COMMISSION ORDERS.

█ Mobil's arguments are directed at the Commission's finding that

> Nothing in the Emergency Petroleum Allocation Act or the regulations suggests that Mobil's duty to supply gasoline and other products is conditioned upon the lawful possession of the retail site by the retailer.

Order at 5. Mobil argues that this conclusion contradicts this court's holdings in *Atlantic Richfield Co. v. Zarb,* 532 F.2d 1363 (Em.App.1976), and *Marathon Oil Co. v. FEA,* 547 F.2d 1140 (Em.App.1976), and prior Department decisions. It also claims that the Commission's order is beyond the agency's authority and not supported by substantial evidence.

We do not construe the paragraph, quoted above out of context, to mean that *adjudicated* unlawful possession is irrelevant to

a supplier's duty to supply products under 10 C.F.R. § 211. Rather, we read the Commission order, as the district court did, to permit termination of deliveries only "*after a final state court judgment that the seller is in unlawful possession of the retail premises.*" District Court Conclusions of Law at 8. That the Commission agrees with our reading is shown by its quotation, with approval, of the Department order's language that

> [t]he DOE need not either determine or presume that Rossi & Siemer's occupation of the station site is lawful; rather, it may defer such a determination to the appropriate state judicial authorities... [T]he DOE's policy allows the agency to enforce existing supply relationships pending the resolution of property disputes.

Decision and Order 23, quoted in Commission Order at 5.

### A. *Atlantic Richfield and Marathon Oil.*

We first address and remove the linchpin of Mobil's appeal, its argument that *Atlantic Richfield* requires us to overturn the agency orders as illegal. In support, Mobil cites a characterization of the *Atlantic Richfield* holding by this court in *Marathon Oil,* 547 F.2d at 1142, n. 7, that the attempt of a retailer who was a holdover tenant "to tie his product demand to an illegal occupancy did not invoke any right pursuant to the continuation of wholesale-purchaser relationships requirement [of the allocation regulations]."

There is a fundamental difference between *Atlantic Richfield* and this case. In that case, the service station lease had expired, after renewal had been refused on July 31, 1973. When the tenant refused to vacate, the oil company obtained a state justice court judgment for possession on August 29, 1973. The Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.* (Pub.L. No. 93–159, 87 Stat. 627, 635), was enacted on November 27, 1973. At that time, the tenant's lease had expired, and his possession of the service station had been held unlawful by a state court. The regulations were issued on January 14,

1974, 39 Fed.Reg. 1924 (1974). In June, 1974, Atlantic Richfield obtained a second judgment against the tenant in ejectment in the state court. Not until after the second judgment did the agency begin proceedings on July 25, 1974 to compel Atlantic Richfield to supply gasoline to the tenant, who had not yet been physically ousted.

It was in the light of these facts that we held the agency's order to be invalid. We emphasized that the Act could not be given retroactive effect, *Atlantic Richfield Co.,* 532 F.2d at 1371–1372, and that the relationship between the oil company and its tenant had terminated, and the tenant's possession had been found unlawful by two courts, before the agency began its proceeding. Our opinion concluded:

> Most importantly here, the Emergency Petroleum Allocation Act of 1973, as amended, never authorized the FEA to allocate and control ARCO's service station property, which the FEA attempted to do by the issuance of the Remedial Order in controversy.

*Id.* at 1372.

It is that language on which Mobil heavily relies. However, that language must be read in the light of the facts of the case that was before us. It applied to the facts of that case; it does not control this case, in which the facts are quite different. Here, the lease was in effect when the Act was enacted and when the regulations were adopted. It is thus undisputed that they applied to Mobil and Rossi and Siemer, and that the former was under a duty to supply gasoline and that the latter had a right to receive it. The lease did not expire until December 31, 1976, and the tenants' possession was not held unlawful by the state court until 1981.

In this case the Department properly recognized that it lacks authority to resolve disputes regarding real property. As it stated:

> Any attempt by the DOE to determine whether Mobil's belief concerning Rossi and Siemer's illegal occupancy is correct would require the agency to consider and

to some extent resolve the very claims and legal theories that are now being adjudicated in the California state courts. Order at 21. This is consistent with the closing sentence of our decision in *Atlantic Richfield,* quoted above. The Department did not impermissibly regulate property when it required Mobil to resume deliveries. The characterization of our holding in *Atlantic Richfield* by *Marathon Oil,* favored by Mobil, is not controlling because it is dictum. Moreover, it concerned an occupancy that was "illegal." Mobil's argument that the order was in effect *pendente lite* relief in a property dispute, outside the agency's direct authority under 10 C.F.R. § 205.204, is meritless.

Mobil further argues that a decision against it here will encourage retailers to hold over unlawfully, confident that their supply of products will continue even though they may have no right to be on the premises. It also contends that existing administrative penalties and federal court relief are sufficient to discourage suppliers from cutting off deliveries to retailers who are in lawful possession. It argues that if, after a delivery cut-off, a state court were to find that the retailer's possession had been legal, damages would make the retailer whole. We are not persuaded.

The Allocation Act not only protects retailers, but, more importantly, the public, by assuring a continuing equitable distribution of allocated products. See Emergency Petroleum Allocation Act of 1973, as amended, 15 U.S.C. § 753(b)(1)(F). The program could be undermined if supplies could be cut off by a distributor-lessor any time it alleges unlawful possession by a retailer-tenant.

### B. *Previous agency rulings.*

Mobil argues that the Department and Commission orders, relied upon by the district court, contradict previous agency rulings. They do not. In *Atlantic Richfield Co.,* 6 FEA ¶ 80,528, Energy Mgmt. (CCH) (Aug. 3, 1977), the agency affirmed a Department remedial order requiring, as did the one at issue here, a supplier to resume deliveries to a retailer who was a holdover

tenant. Consistent with a supplier's obligation to deliver products to a retailer "at any location to which [the retailer] has the right of possession," the Department required deliveries to continue to the retailer until entry of an adverse judgment after a trial in a state court on the issue of possession. 6 FEA at p. 80,666. In *Cities Service Oil Co.,* 1 DOE ¶ 80,172, Energy Mgmt. (CCH) Dec. 21, 1977, the Department ordered deliveries to continue under similar circumstances.

Mobil directs our attention to no post-*Atlantic Richfield* order inconsistent with the Department's present insistence on continued delivery of gasoline and other products unless and until a state court adjudicates that the retailer is occupying the site unlawfully.

### C. *Substantial evidence.*

Mobil argues that the Department order was not supported by substantial evidence demonstrating that Rossi and Siemer occupied the service station lawfully. This argument misconstrues the Department's rational and reasonable interpretation of § 211 that deliveries must continue as long as there is no state court adjudication that the retailer possessed the site unlawfully. As there was at that time no such state court judgment, substantial evidence supported the order compelling the resumption of deliveries.

The Department did not, as Mobil contends, arbitrarily create an irrebuttable presumption of lawful possession until the entry of a state court judgment to the contrary. That presumption, if it is to be termed that, was required by this court's ruling in *Atlantic Richfield* that the agency "simply has no authority to regulate directly or indirectly the use of real property, or the leasing of service station property." 532 F.2d at 1370. Footnote 13 of that opinion, cited by Mobil, is inapposite. It disapproves a purported irrebuttable presumption erected by the agency that, if the retail sales site is not vacated, the retailer has not gone out of business under § 211.106(c), even when state courts had determined the retailer's continued occupancy to be unlawful. That is not the case here.

The district court was correct in adopting the Department's interpretation of the Allocation Act regulations. As we construe the interpretation, it is neither plainly erroneous nor inconsistent with other regulations. *Koch Refining Co. v. DOE*, 658 F.2d 799, 803 (Em.App.1981). Moreover, the Department and Commission orders were neither in excess of the agencies' authority nor based on findings not supported by substantial evidence. § 211(d)(1), 12 U.S.C. § 1904 note.

## IV. MOBIL'S OTHER CONTENTIONS.

### A. *Expert witness testimony.*

■ Mobil argues that it was error to permit Rossi and Siemer's expert witness, McEntee, to testify about average profit margins of service stations with which he was not specifically familiar, gasoline pricing decisions, market conditions affecting Rossi and Siemer's station, and about marketing in the gasoline industry in general.

The trial court approved McEntee's testifying in the areas of "gallonage and profitability figures that certain service stations would be likely to obtain." Mobil argues that McEntee's background as a bookkeeper for Rossi and Siemer and other service station operators does not qualify him to testify on the areas cited. Mobil overlooks the fact, however, that McEntee testified that he provided bookkeeping services for approximately 200 service stations, that he was the west coast agent for five years for a company providing management services to station operators, that he was familiar with competitive conditions in Rossi and Siemer's marketing area, and that he consulted with Rossi and Siemer on the pricing and profitability of their station. The trial judge did not abuse his discretion in permitting McEntee to testify as one "skilled" in the area. Fed.R.Evid. 702 and Advisory Note.

■ A closer question is Mobil's argument that McEntee's damage estimates, and the monthly financial statements from which they were derived, should not have been admitted into evidence. Throughout discovery and a portion of the trial, McEntee represented to Mobil that the monthly financial statements his firm had prepared for Rossi and Siemer were drawn directly from their daily financial records. Those monthly statements were admitted into evidence as such. During cross-examination, however, McEntee revealed that in fact, the expense entries on those monthly statements were estimates drawn from industry averages. Rossi and Siemer operated more than one business from the service station site, but had kept only a single set of books. When, after the lease dispute began, they asked for a separate set of statements showing the condition of the gasoline-related business only, McEntee had prepared statements using average industry expense figures, rather than actual figures from Rossi and Siemer's day-to-day records. Those were the statements introduced into evidence to form the basis for McEntee's estimate of Rossi and Siemer's losses during the disputed period.

We do not approve of Rossi and Siemer's concealment throughout discovery of their use of industry averages, rather than actual expenses. Mobil is correct that the financial statements were not admissible hearsay under Federal Rule of Evidence 803(6). The statements were not compilations of regularly kept business records, but exhibits specifically prepared for this litigation. *See Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

We do not, however, find that the district judge abused his discretion in admitting the evidence. McEntee was qualified as an expert witness, and as such, was entitled to rely on inadmissible evidence in forming his opinions. Fed.R.Evid. 703, 704. The only requirement was that the facts or data relied upon be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. *See Standard Oil Co. of California v. Moore*, 251 F.2d 188, 222 (9th Cir.1957).

We note that McEntee underwent considerable questioning by counsel for Mobil and that, although surprised by the disclo-

sure of his "estimate" methodology, Mobil was able to attack it to a certain degree on cross-examination and in closing argument. Furthermore, it is not clear that Mobil was substantially prejudiced by the admission of the estimates. *See Kotteakos v. United States,* 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1247–1248, 90 L.Ed. 1557 (1946); *Schneider v. Lockheed Aircraft Corp.,* 658 F.2d 835, 844 (D.C.Cir.1981). The jury discounted McEntee's calculation of between $245,698 and $292,847 when it returned an award of $162,000.

For these reasons, we find no abuse of discretion in the admission of the evidence.

### B. *Mitigation.*

■ Mobil also claims error in the trial judge's refusal to instruct the jury that Rossi and Siemer could have mitigated their damages by arranging for delivery and sale of their allocated gasoline to another dealer. At trial, Mobil introduced a letter dated March 9, 1978, in which Mobil offered to deliver Rossi and Siemer's allocation to another location they designated within the same marketing area. The judge instructed the jury,

> During the cross-examination of Mr. McEntee, there was an implication raised that the plaintiffs might have attempted to sell or assign their allocation of gasoline for the period from March 1979 [sic] through September 1979 to one or more other dealers. You are instructed that pursuant to federal law the right to an allocation is not separately assignable and may be transferred only if the entire business or activity of the firm is terminated.

Transcript at 569. The trial judge relied on 10 C.F.R. § 211.11(d) (1977), which provides,

> The right to receive an allocation shall not be assignable separately but shall be considered an integral part of the ongoing business or established end use. The right to an allocation shall be deemed to have been transferred only when the entire business or activity of the firm is transferred to a successor firm.

Mobil's argument that § 211.11(d) permits a retailer to assign a particular *deliv-* ery of gasoline, as opposed to the "right to receive" gasoline, is unfounded. Mobil says that such a transfer of gasoline would be consistent with the Allocation Act, as long as the recipient retailer was located in the same marketing area as Rossi and Siemer. We disagree, however, on the authority of the Department's Interpretation No. 77–47, December 21, 1977, found at Fed. Energy Guidelines (CCH) ¶ 56,384.

That interpretation dealt with a gasoline retailer who purchased a second service station, along with its allocation rights, in the same marketing area, and sought to transfer the allocation attributable to his first station to the new station. Thereby, rather than operating two stations in the same marketing area, he would be operating one station with the allocation of two stations. Although the operator no longer sold gasoline from the first site, he remained in possession. The Department held that the retailer could not transfer the allocation belonging to the first station without complying with 10 C.F.R. § 211.106(c)(1) (1977), requiring, *inter alia,* that the retailer vacate the first site. *Id.* at p. 56,485. In addition, the retailer had not satisfied the condition of § 211.106(c)(1)(iii) requiring him to "reestablish another retail site." The agency said that he had merely transferred the first station's allocation to another location—the one he had just purchased—of an ongoing business. *Id.*

Mobil argues that this Interpretation means only that the retailer could not transfer his allocation without the consent of the supplier. There is nothing in the Interpretation, however, indicating that the supplier of the original station objected to delivering the allocation to the new station. The trial judge was correct in ruling that, because Rossi and Siemer remained in possession of the service station, they could not transfer their gasoline allocation elsewhere.

### V. Rossi and Siemer's Appeal.

In No. 9–67, Rossi and Siemer argue that the district court should have granted them treble damages and attorney's fees, and

seek a new trial for the reason that they were prejudiced by substantial errors of law.

A. *Treble damages and attorney's fees.*

■ Section 210 of the Economic Stabilization Act, incorporated into the Allocation Act by 15 U.S.C. § 754, states:

(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including . . . damages.

(b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plaintiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:

(1) an amount not more than three times the amount of the overcharge upon which the action is based, or

(2) not less than $100 or more than $1,000

12 U.S.C. § 1904 note.

Rossi and Siemer did not allege that Mobil had overcharged them for gasoline. Their claim was that it had failed to deliver gasoline to them to which they were entitled. The district court refused their request for treble damages and attorney's fees, apparently in the belief that such relief was foreclosed by § 210(b)'s express reference only to overcharges:

Plaintiffs . . . now petition the Court to treble the damages and award attorney fees. They cite Section 210 of the Economic Stabilization Act of 1970, which deals with overcharges.

The motion is denied.

District court order of April 6, 1982.

Rossi and Siemer argue that it is illogical to permit recovery of treble damages for an overcharge but not for injury caused by a supplier's failure to deliver gasoline, when the result of a supply cut-off can be more severe than overcharging for gasoline that is delivered. For support for their proposition that § 210(b) permits treble damages in their case, they rely primarily on language found in *Bulzan v. Atlantic Richfield Co., supra,* where we upheld the right of a commission supplier of petroleum products to pursue a private action under § 210 for an allocation violation after he had already been awarded an administrative remedy. Specifically, they cite our statement that § 210

provides treble damages and injunctive relief for any person who has suffered a legal wrong because of a violation of a regulation promulgated under the [Allocation Act].

*Bulzan v. Atlantic Richfield Co.,* 620 F.2d at 280 (Em.App.1980).

The Commission supplier in *Bulzan,* like Rossi and Siemer, did not allege overcharges; he alleged violations of a wholesale purchaser-reseller relationship. It is true that our opinion there several times mentioned the supplier's claim for treble damages, and, in fact, at one point suggested that the damage claim particularly supported his private right of action:

[P]rivate remedies under section 210, and in particular the remedy of treble damages, not only encourage aggrieved parties to come forward with their complaints (thereby supplementing the enforcement machinery of the government); they also provide a strong deterrent to any would-be violator of a FEA or DOE regulation.

*Id.* at 282.

But our holding in *Bulzan* did not depend on the supplier's claim for treble damages; indeed, we did not there decide the validity of that claim. As we stated our conclusion,

[W]e now hold that the entry of a remedial order . . . does not foreclose the complainant's right to institute a private action for damages and injunctive relief under section 210.

*Id.* at 283, *see also id.* at 284. It is thus clear that our attention in *Bulzan* was not directed to the supplier's claim for *treble* damages, but to his claim for any damages

at all, in view of the fact that he had already received administrative relief.

Finally, faced directly with the issue as we are here, we are constrained to follow the plain language of the statute, which provides for treble damages only for overcharging. *See Eastern Air Lines, Inc. v. Mobil Oil Corp.*, 677 F.2d 879, 881 (Em.App. 1982) (" '[o]vercharge' is a term of art under § 210(b, c) of the ESA, relating only to charges in excess of the ceiling price under the price regulation.")

Rossi and Siemer argue that the appearance of "overcharge" only in § 210(b) is not significant, considering that the section was incorporated into the Allocation Act from the Economic Stabilization Act of 1970, which dealt with price controls, not petroleum allocation. 15 U.S.C. § 754(a)(1). But we do not think it likely that, as Rossi and Siemer suggest, Congress' failure to modify § 210 for purposes of the broader Allocation Act is a mere oversight. The word "overcharge" appears several times in subsection (b), and subsection (c) is devoted to defining the term.

The legislative history of 15 U.S.C. § 754 supports our view. The Senate bill contained a provision for a private enforcement remedy "which [would] prohibit failing to sell petroleum products to petroleum distributors and retailers at prices and *in quantities* determined under [the determined allocation]." Conference Report 93–628, *reprinted in* 1973 U.S.Code Cong. & Admin.News 2582, 2688, 2707–2708 (emphasis added). The Senate version also included punitive damages and attorney's fees for such violations. *Id.* at 2708. The conference chose not to accept that version, however, adopting instead the Economic Stabilization Act section, which provides for treble damages and attorney fees only as a remedy for overcharges.

### B. *Mitigation.*

Rossi and Siemer next argue that the trial court's rulings admitting or excluding certain evidence of the rent dispute, and jury instruction on mitigation of damages, deprived them of a fair trial and led to an unreasonably low damage verdict in their favor.

The trial judge allowed the introduction of evidence of the amount of rent Mobil was demanding in a proposed new lease, of Rossi and Siemer's not paying rent to Mobil, and of a state court's ruling in Mobil's favor in that dispute. It excluded evidence that the state court had declined to order Rossi and Siemer to pay rent while the proceeding there was pending, and had eventually ordered Rossi and Siemer to pay only the $1,575 due under the expired lease, not the $2,150 demanded by Mobil.

Rossi and Siemer point out that the judge struck Mobil's counterclaim for unpaid rent before the trial began, and argue that the evidence of the dispute was prejudicial and irrelevant. They assert that the jury verdict is unreasonably low because, while the evidence showed that the average Los Angeles area service station's margin on gasoline sold was 8.3 cents per gallon in 1978 and 14 cents in 1979, the verdict amounts to a margin of only 5.19 cents per gallon, even assuming no losses attributable to the decline in their mechanical repair business after the removal of the Mobil name from their station. They conclude that the jury improperly offset the total amount of unpaid monthly rent demanded by Mobil against the damage estimate provided by their expert, McEntee, to arrive at the verdict.

Mobil argues that the evidence of the rent dispute was relevant (1) to rebut Rossi and Siemer's allegation that Mobil cut off their gasoline willfully and deliberately to run them out of business, and (2) to show that Rossi and Siemer could have mitigated their damages by paying the disputed rent under protest.

We do not see the relevancy of Mobil's motives to the issue of Rossi and Siemer's lost profits, particularly because the trial judge instructed the jury that it was not to award damages for the purpose of punishing Mobil or to serve as an example or warning to others. Transcript at 575. We do, however, agree that the evidence was relevant to Rossi and Siemer's duty to rea-

sonably mitigate damages. Mobil suggested to Rossi and Siemer during the course of their dispute that if they were to pay the amount of rent sought by Mobil—an increase of $575 a month over the expired lease amount of $1,575—gasoline deliveries would continue while the parties litigated the rent dispute. Whether it would have been reasonable for Rossi and Siemer to have done so was properly for the jury to decide. Rossi and Siemer have not directed our attention to anything in the record suggesting to the jury that it offset unpaid rent against lost profits.

Rossi and Siemer argue that their expert witness testimony was "undisputed" because Mobil failed to present evidence controverting their projections or underlying assumptions. As we discussed above, however, Mobil might have put on evidence controverting Rossi and Siemer's damage assessments and assumptions, had it been aware, before the trial was half over, that Rossi and Siemer's estimates were based on average industry costs, not actual expense figures. It is reasonable to believe that the jury independently assessed the credibility of those assumptions in reducing Rossi and Siemer's expert's estimation of lost profits.

Furthermore, we note that any prejudicial effect of the evidence as to the rent dispute is mitigated by other factors. Even though the judge refused to permit testimony that the state court unlawful detainer finding against Rossi and Siemer was on appeal, counsel for Rossi and Siemer did manage to make the appeal known to the jury. Transcript at 413. In addition, Siemer testified that Mobil refused to accept their offer to pay the amount of rent due under the expired lease, and in fact returned one payment. Transcript at 59.

■ Rossi and Siemer assert that the trial judge erred by refusing to instruct the jury that a plaintiff has no duty to mitigate damages when both the plaintiff and the defendant "have an equal opportunity to reduce the damages and it is equally reasonable to expect the defendant to take steps to minimize damages." Instead, the judge instructed that

[T]he law imposes upon a party injured by another's actions the duty of using all ordinary care and making all reasonable efforts and expenditures of money to render the injury as light as possible. If by his own actions or failure to act he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him, the plaintiff.

. . . .

[T]he conduct taken by the injured party in response to defendant's wrongdoing must have been reasonable.

Reasonable conduct is to be determined from all the facts and circumstances of each case . . . .

The law does not require that a plaintiff incur undue risk, expense or humiliation in order to mitigate damages.

Transcript at 575–576.

Applying their requested instruction to the facts, Rossi and Siemer argue that (1) it would have been just as easy for Mobil to have continued delivering gasoline, under protest, during the litigation, as it would have been for them to pay the disputed rent, under protest; (2) therefore, they were under no duty to pay rent in order to mitigate the injury caused by Mobil's cutoff of gasoline deliveries.

Rossi and Siemer's theory is incorrect. It would relieve every plaintiff of the duty to mitigate because the defendant could have mitigated by not breaching the contract in the first place. *Toyota Industrial Trucks U.S.A. Inc. v. Citizens National Bank of Evans City,* 611 F.2d 465 (3d Cir.1979), and *S.J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524 (3d Cir.1978), are inapposite because they deal with situations where both parties could have reduced damages by performing *the same act.*

More to the point is *Henrici v. South Feather Land & Water Co.,* 177 Cal. 442, 170 P. 1135 (1918), where the court held that the plaintiff farmer had an obligation to pay for a continued supply of irrigation water during the pendency of a contract dispute over the new asking price. Because

the farmer had refused to pay for *any* water at the new price, none was delivered, and he suffered crop losses. For "only a few dollars more," he could have "reduced the damage to a comparatively trifling sum. This it was plainly his duty to do." 177 Cal. at 449, 170 P. 1135.

We find no reversible error.

### C. *Damage to goodwill.*

■ Finally, Rossi and Siemer argue that they are entitled to a new trial because the district court wrongfully excluded evidence of continuing injury to their goodwill that they claim to have suffered after Mobil's resumption of gasoline deliveries in September 1979. The judge excluded the evidence because it was beyond the scope of the pretrial conference order. In light of the facts that the order was ambiguous, and that expert McEntee failed to clearly indicate such a claim in pretrial deposition testimony, we will not overturn the district court's decision. It was within his discretion to limit proof at trial to issues presented by pretrial orders and statements. *See Rodrigues v. Ripley Industries, Inc.*, 507 F.2d 782, 786–787 (1st Cir.1974); *Rigby v. Beech Aircraft Co.*, 548 F.2d 288, 291–292 (10th Cir.1977). Even if the exclusion of the evidence was an abuse of discretion, the alleged damage, said by McEntee to have "no effect—very little effect on the whole figure," Deposition Transcript of January 1, 1982, at 111, did not substantially prejudice Rossi and Siemer's right to a fair trial.

In each appeal, the judgment is affirmed.